Schuyler C. Eubank IV brought an action in the Montgomery County Circuit Court against Central Alabama Home Health Services, Inc. ("CAHHS"), and its president, George E. Hutchinson, alleging counts of breach of contract and account stated based upon consulting work Eubank had performed for CAHHS; Eubank sought damages in the amount of $12,393.95 plus interest. The court held a two-day jury trial on Eubank's claims; during the trial CAHHS moved for a judgment as a matter of law (see Rule 50(a), Ala.R.Civ.P.), asserting that Eubank was not entitled to recover from CAHHS because, it claimed, Eubank had not obtained certain state occupational licenses that *Page 259 
CAHHS contended he was required to hold. The trial court denied the motion, and the jury was not instructed about that defense. Without objection, the court entered a judgment in favor of Hutchinson at the close of Eubank's case. The jury returned a verdict in favor of Eubank and against CAHHS, in the amount of $12,363.90 plus six percent interest assessed from October 1, 1994, and the trial court entered a judgment on that verdict. CAHHS filed a renewed motion for a judgment as a matter of law or, in the alternative, for a new trial, but the court denied that motion. CAHHS appeals.
CAHHS argues that Eubank's work was work in the nature of that of a "general contractor" and an "architect," and that because he lacked state licenses to perform general-contracting work or architectural work, his claim must fail, as a matter of law.[1] In support of its contentions, CAHHS cites a line of cases construing Alabama's general-contracting licensure statutes, § 34-8-1 et seq., Ala. Code 1975, as barring an unlicensed general contractor's recovery of any moneys claimed with respect to work performed without the required license; the rationale of those cases is that contracts, both express and implied, made by persons within the scope of the general-contractor licensure laws who have failed to obtain the required license are contrary to public policy. See Cooper v. Johnston, 283 Ala. 565, 569,219 So.2d 392, 396 (1969).[2] CAHHS contends, and we will assume (without deciding), that these authorities also apply, by analogy, to its contention that Eubank performed architectural services without a license.
We note that the trial court denied the preverdict Rule 50 motion on the ground that there was before the court evidence indicating that Eubank's work was not that of a "general contractor" or an "architect" and that that evidence was sufficient to create a jury question on that issue, although it gave no reasons for denying the postverdict motion. We review the trial court's determination with respect to the original and renewed motions for a judgment as a matter of law under the following standard:
 "`The standard of review applicable to a motion for directed verdict or judgment notwithstanding the verdict [now, preverdict and postverdict motions for a judgment as a matter of law] is identical to the standard used by the trial court in granting or denying the motions initially. Thus, when reviewing the trial court's ruling on either motion, we determine whether there was sufficient evidence to produce a conflict warranting jury consideration. And, like the trial court, we must view any evidence most favorably to the non-movant.'"
Glenlakes Realty Co. v. Norwood, 721 So.2d 174, 177 (Ala. 1998) (quotingBussey v. John Deere Co., 531 So.2d 860, 863 (Ala. 1988)). In the context of a Rule 50 motion for a judgment as a matter of law, our Supreme Court has noted that "the standard for testing the sufficiency of the evidence is the `substantial evidence *Page 260 
rule,'" and that "[s]ubstantial evidence is `evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'"State Farm Fire Cas. Ins. Co. v. Owen, 729 So.2d 834, 835
(quoting West v. Founders Life Assur. Co. of Florida,547 So.2d 870, 871 (Ala. 1989)).
In order to demonstrate entitlement to a judgment as a matter of law on a nonlicensure defense, a party must prove (with respect to an alleged general contractor): (1) that the alleged contractor was unlicensed; (2) that the contracted work was of the type covered by the licensure statute; and (3) that the "cost" of the work was $20,000[3] or more.Tucker v. Walker, 293 Ala. 589, 592, 308 So.2d 245, 247 (1975) (summary judgment). Because Alabama's architecture-licensing statutes do not include any monetary limitations concerning services otherwise within the scope of those statutes, only the first and second elements set forth inTucker are pertinent to CAHHS's contention that Eubank's services were services of an "architect."
We now turn to the key issue: did the trial court err in concluding that Eubank presented substantial evidence that his services were not those of a "general contractor" or an "architect" so as to negate the second element set forth in Tucker?
Eubank entered into an agreement with Hutchinson in August 1993 by which Hutchinson agreed to pay Eubank $20.00 per hour and 32 cents per mile traveled by automobile for Eubank's services on behalf of CAHHS; Eubank was terminated in June 1994. Eubank's title with CAHHS was "property manager." According to Eubank, CAHHS was looking for someone who could meet with CAHHS personnel to obtain information on what the various corporate divisions of CAHHS would need in future building projects, as well as meet with bankers to discuss financing for and to "package" designs and preliminary cost estimates regarding large construction projects. Eubank also testified that CAHHS needed a person to meet with architects, engineers, and real-estate professionals to select a piece of property and properly develop it. Eubank testified that he was to perform "all the leg-work and coordination it would take to put a large project together."
Eubank's work for CAHHS was principally centered upon two planned construction projects: a corporate central office in Montgomery ("the Montgomery office") and a branch office in Valley, Alabama ("the Valley office"). The Montgomery office project concerned a proposed addition to CAHHS's existing headquarters.[4] For that project, CAHHS hired an architect named Jeff Johnson. Eubank testified that he had served as a "coordinator" between CAHHS, Johnson, and "engineers, contractors, whatever it took to try to put th[e] project together and get it done" quickly. Johnson testified that his role as architect had been to prepare the plans and the construction documents for the Montgomery office and to supervise its construction; Johnson also testified that Marshall Construction Company had submitted *Page 261 
the lowest bid for, and had later served as the general contractor for, the Montgomery office. Johnson also testified that Eubank had acted as "the contact or the liaison between the corporate staff and [his] office," that Eubank had compiled requirements from CAHHS department heads, and that Eubank had helped him prepare schematic plans, loan packaging, and development plans to be submitted to the City of Montgomery.
The Valley office was envisioned as a leased prefabricated metal building and the general contractor for that building was Rod Spraggin, a dealer for Gulf States Manufacturing. Spraggin testified that he and Eubank (on behalf of CAHHS) had been involved in preliminary negotiations concerning Spraggin's constructing a building and concerning where the building was to be located; Eubank testified that these negotiations had begun in September 1993. Spraggin was later chosen by Hutchinson to construct the Valley office on a "rush" basis later that year because a lease CAHHS had had in another building in Valley had been terminated; the new building was substantially completed in January 1994. Spraggin testified that during his construction of the building, he had seen Eubank or had talked to Eubank practically every day. Spraggin also testified that no architect had worked on the project,[5] although Gulf States had provided an "engineering stamp" for the Valley office building. Moreover, although Spraggin testified that Eubank had given him an initial floor plan and a drawing representing how the exterior of the office should look, he had been told by CAHHS essentially to duplicate the plan of its office in Phenix City.
Section 34-8-1(a), Ala. Code 1975, in pertinent part, defines a "general contractor" as "one who, for a fixed price, commission, fee or wage, undertakes to construct or superintend or engage in the construction, alteration, maintenance, repair, rehabilitation, remediation, reclamation, or demolition of any building, . . . structure, site work . . . or project or any improvement" in the state. Similarly, § 34-2-30(2), in pertinent part, defines the "practice of architecture" as an individual's rendering (or holding himself or herself out as able to render) "any service . . . concerning the design and observation of construction of buildings."
We cannot conclude that the services provided by Eubank to CAHHS were, as a matter of law, those of a "general contractor" or an "architect." In addition to Eubank's testimony concerning his "go-between" role for CAHHS, both Eubank and Hutchinson, CAHHS's president, testified that Hutchinson did not hire Eubank to serve as an architect or as a general contractor. Thus, substantial evidence indicated that the parties did not envision Eubank's work as that prohibited to unlicensed individuals by the licensure statutes, but envisioned it only as work representing CAHHS in its dealings with bankers, architects, and contractors. Herbertv. Birmingham-Jefferson Civic Ctr. Auth., 694 F.2d 240, 242 (11th Cir. 1982) (evidence describing alleged contractor's position as "broker", "consultant", "advisor", and "coordinator" for other contracting party barred the entry of summary judgment based upon nonlicensure defense). Moreover, there was no evidence tending to show that Eubank would have been personally responsible for ensuring the completion of the projects upon which he worked for CAHHS; indeed, the jury could have concluded that Eubank's work was subject to the ultimate control *Page 262 
and revision of CAHHS, his employer, and that CAHHS did not hesitate to exercise that control. See Sobel v. Jones,96 Ariz. 297, 394 P.2d 415 (1964) (licensure held not required where ultimate control of construction projects remained with owner of premises, not employee of owner, and alleged contractor would not have been required to complete job on his own responsibility). Finally, Eubank's design work for the Montgomery office was under the supervision of Johnson, a licensed architect. Thus, while the jury might have determined that Eubank's work required licensure, had that issue been submitted for its resolution, it would not have beenrequired to so conclude. Because there was sufficient evidence to at least produce a conflict on the issue whether Eubank's services were those of a "general contractor" or an "architect," the trial court properly denied the motions for judgment as a matter of law.[6]Glenlakes Realty, 721 So.2d at 177.
Based on the foregoing facts and authorities, the judgment of the trial court is due to be affirmed.
AFFIRMED.
Yates, Monroe, Crawley, and Thompson, JJ., concur.
[1] We note that this legal issue was preserved by its presentation in a proper motion pursuant to Rule 50, and that it was not waived by the appellant's failure to request jury instructions concerning it. SeeBarnes v. Dale, 530 So.2d 770 (Ala. 1988). Thus, any contention that CAHHS's answer was or was not amended to conform to the evidence presented is moot.
[2] We note that although the nonlicensure issue was not included in CAHHS's answer as an affirmative defense, the Alabama Supreme Court has held that, as a matter of public policy, a nonlicensure defense will not be waived by a failure to plead it affirmatively. See Brown v. MountainLakes Resort, Inc., 521 So.2d 24 (Ala. 1988).
[3] That amount is taken from the version of § 34-8-1(a), Ala. Code 1975, in effect until December 31, 1997. Neither party contends that Act No. 97-270, 1997 Ala. Acts, which took effect on January 1, 1998, and which increased that amount to $50,000, applies to this case.
[4] At CAHHS's later election, the proposed addition was not constructed until 1995, after Eubank's services had been terminated in June 1994.
[5] Johnson, the architect for the Montgomery office, testified that he had served as a "consultant" on CAHHS's branch offices when questions would arise.
[6] We thus do not reach the question whether the value of Eubank's services with respect to the Montgomery office and to the Valley office, both of which individually amount to less than $20,000, are to be aggregated in computing whether his "undertaking" cost CAHHS $20,000 or more, which is the third element set forth in Tucker as to general contractors.