The defendants, Glenlakes Realty Company, Yarborough Lakeview Corporation, Gorrie Lakeview Corporation, Murray Lakeview Corporation, Joseph Yarborough, Miller Gorrie, and Roger Murray, Jr., appeal from a judgment entered by the circuit court on a jury verdict in favor of Thomas Norwood. For the reasons explained below, we reverse the judgment and remand the cause for a new trial. *Page 176 
Glenlakes Realty Company is a partnership composed of three partners, Yarborough Lakeview Corporation, Gorrie Lakeview Corporation, and Murray Lakeview Corporation. The corporations are wholly owned and operated by the defendants Joseph Yarborough, Miller Gorrie, and Roger Murray, Jr., respectively, who are the presidents of the corporations. In 1991, Glenlakes Realty purchased the Lakeview Golf and Country Club ("LGCC"), approximately 150 residential lots in the surrounding Lakeview Estates, and additional undeveloped adjacent land. Approximately 200 other lots in Lakeview Estates had already been sold to individual owners when Glenlakes Realty purchased the remaining portion of the development. The entire development, including the LGCC, all the lots in Lakeview Estates, and the undeveloped land totalled approximately 820 acres. However, because more than half the lots in Lakeview Estates had already been sold to private owners, the amount of land purchased by Glenlakes Realty was only approximately 665 acres.
In November 1991, Glenlakes Realty entered into an exclusive listing agreement with Norwood, a licensed real estate broker, who was to be its qualifying broker. The listing agreement was for "all properties located at Lakeview Estates and surrounding undeveloped parcels at Lakeview Golf and Country Club, totalling approx. 820 acres." The agreement was to expire on January 1, 1993. However, the agreement would pay Norwood a sales commission "if within 180 days of the expiration of this Sales Authority the property is sold by you, or Me/Us, or anyone else, if You [Norwood] produce a Purchaser ready, willing and able to purchase the property . . . provided that you make known to Me/Us in writing the names of anyone to whom you have shown or presented the property."
In April 1992, the Sycamore Group, an out-of-state real estate sales company that specialized in the sale of golf courses, contacted Harry Watkins, the general manager for Glenlakes Realty, and asked whether the LGCC was for sale. Watkins informed Yarborough, Gorrie, and Murray of Sycamore's interest in the LGCC. Glenlakes Realty first responded by informing Sycamore that it had no interest in selling the LGCC, but then it reconsidered. In June 1992, Glenlakes Realty entered into a listing agreement with Sycamore to pay it a commission if the LGCC was sold to a buyer found by Sycamore. Shortly thereafter, Watkins told Norwood that Glenlakes Realty had entered into a listing agreement with Sycamore and that he had been instructed not to tell Norwood about it. Although Norwood believed that he had an exclusive listing on the LGCC, he did not question Yarborough, Gorrie, or Murray about Sycamore, and Watkins did not report Norwood's belief to them.
Watkins was terminated from his position as general manager of Glenlakes Realty in December 1992, and the position was not filled. The duties Watkins had performed were divided among the staff of Glenlakes Realty and the LGCC, and Norwood took on additional responsibilities without additional compensation.
Although Norwood's listing agreement expired on January 1, 1993, he continued to sell residential lots in Lakeview Estates and was paid commissions for the sales. The purchase contract for each lot contained a provision for a sales commission to the selling agent.
In January 1993, Sycamore named LinksCorp as a potential purchaser of the LGCC, and in March it brought several LinksCorp representatives to the LGCC for a tour of the facility. Then in June 1993, LinksCorp and Glenlakes entered into a nonbinding letter of intent for the sale of the LGCC. Also in June, Norwood entered into a new listing agreement with Glenlakes Realty for the sale of the remaining residential lots in Lakeview Estates. In September 1993, LinksCorp and Glenlakes Realty executed a purchase agreement. The agreement required certain "due diligence" work on the part of Glenlakes Realty. That work was performed by Norwood and, apparently, he was not compensated for it. In January 1994, the sale of the LGCC from Glenlakes Realty to LinksCorp closed and Glenlakes realty paid Sycamore a $232,000 sales commission.
Norwood was not paid a commission with regard to the sale of the LGCC, and in February 1995 he wrote a letter to Murray *Page 177 
requesting that he be paid a commission. The defendants refused Norwood's request, and in January 1996 Norwood sued them. Norwood's complaint claimed damages for breach of contract, fraudulent misrepresentation, fraudulent suppression, conspiracy, and tortious interference with contract, and sought a recovery on the theory of quantum meruit. Norwood claimed a $290,000 sales commission, plus $1,000,000 in damages for mental anguish and $1,000,000 in punitive damages.
The trial court denied the defendants' motion for summary judgment, and the case went to trial. At trial, the defendants moved for a preverdict judgment as a matter of law ("JML"), [1] but the court denied the motion and submitted all of Norwood's claims to the jury. The jury returned a general verdict in favor of Norwood for $200,000 in compensatory damages. The defendants then moved for a postverdict JML, a new trial, or a remittitur. The trial court denied the motion and entered a judgment on the jury verdict. The defendants appealed.
 I.
We must determine whether the trial court erred in denying the defendants' pre-verdict motion for a JML and their post-verdict motion for a JML, a new trial, or a remittitur. In Bussey v.John Deere Co., 531 So.2d 860, 863 (Ala. 1988), this Court stated:
 "The standard of review applicable to a motion for directed verdict or judgment notwithstanding the verdict is identical to the standard used by the trial court in granting or denying the motions initially. Thus, when reviewing the trial court's ruling on either motion, we determine whether there was sufficient evidence to produce a conflict warranting jury consideration. And, like the trial court, we must view any evidence most favorably to the non-movant."
(Citations omitted.) In other words, viewing the evidence in a light most favorable to Norwood, we must determine whether he presented substantial evidence in support of his claims. Moreover, because the jury rendered a general verdict, we must determine whether Norwood presented substantial evidence in support of all the claims submitted to the jury.Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3
(Ala. 1997); Aspinwall v. Gowens, 405 So.2d 134
(Ala. 1981). If the trial court should have directed a verdict as to one or more of Norwood's claims, then we cannot assume that the jury's general verdict in favor of Norwood was returned on a "good" claim or on good claims and the judgment based on the jury's verdict must be reversed. Palm Harbor Homes, supra; Green Tree Acceptance, Inc. v. Tunstall,645 So.2d 1384 (Ala. 1994).
 II.
We first address the issue whether the trial court erred in denying the defendants' pre-verdict motion for JML and post-verdict JML motion as to Norwood's breach of contract claim. Norwood alleged that the exclusive listing agreement he made with Glenlakes Realty in November 1991 included the exclusive right to sell the LGCC, in addition to the residential lots and undeveloped property; that he was due a sales commission in relation to the sale of the LGCC; and that the defendants breached the agreement by refusing to pay him a commission.
The defendants offer several arguments as to why they believe the trial court should have entered a pre-verdict JML or a postverdict JML in their favor on Norwood's breach of contract claim. First, they say that the plain language of the property description in the November 1991 listing agreement between Glenlakes Realty and Norwood does not include the LGCC. They say it includes only the residential lots in Lakeview Estates and the undeveloped property and that the LGCC is mentioned in the description only as a point of reference for the undeveloped property. They further say *Page 178 
that the reference to 820 acres cannot be taken to mean literally 820 acres because Glenlakes Realty purchased only 665 acres and, thus, the mention of 820 acres does not mean that the LGCC was necessarily included.
The defendants next argue that even if the property description in the exclusive listing agreement is considered ambiguous, any ambiguity should be construed against Norwood because, they say, he drafted it. In addition, the defendants argue that the listing agreement should not be interpreted to include the LGCC because, they say, it is undisputed that when the agreement was drafted they had no intention of ever selling the LGCC. As evidence of this fact they point out that Norwood never attempted to find a buyer for the LGCC. Thus, they say that there was never a meeting of the minds to include the LGCC in the listing agreement and that it should not be interpreted to conflict with the intention of the parties.
The defendants next argue that even if the exclusive listing agreement with Norwood could be interpreted to include the LGCC, they did not breach the agreement because, they say, Norwood failed to meet the requirements necessary to earn a commission. They point out that the LGCC was sold to LinksCorp after the January 1, 1993, expiration of the listing agreement and that Norwood never listed LinksCorp as a prospective purchaser even though he was required to list prospective purchasers before the expiration of the listing agreement; and they say that the LGCC was not sold during the 180-day extension of the agreement. They contend that the earliest that it can be said there was a "sale" of the LGCC is September 1, 1993, when a purchase agreement was executed, 243 days after January 1, 1993.
The defendants next argue that Norwood's exclusive listing agreement was not extended by implication beyond January 1, 1993, by the fact that Norwood was paid commissions for sales of residential lots in Lakeview Estates after that date. They say that the commissions were paid to Norwood based on provisions in the purchase contracts for the lots calling for commission payments and not because of an implied agreement to extend the exclusive listing agreement. They further note that Norwood and Glenlakes Realty entered into a second nonexclusive listing agreement on June 26, 1993, for sales of lots in Lakeview Estates, and they argue that the first listing agreement could not be extended by implication beyond that date, since both agreements relate to the same subject matter and an express agreement is controlling over an implied one. The defendants say that Alabama law requires that all real estate listing agreements have a fixed expiration date and that the law prohibits automatic extensions; they say this law reflects a public policy against implied extensions of such agreements. Thus, they argue that Norwood's first listing agreement could not be extended beyond its express January 1, 1993, expiration date, and certainly not beyond June 26, 1993. Finally, the defendants say that even if the first listing agreement was extended by implication, the implied extension could not include the LGCC, because Norwood was aware before the agreement's expiration date that Glenlakes Realty intended not to pay him a sales commission on the LGCC, precluding a meeting of the minds that the extension of the listing agreement included the LGCC.
In response, Norwood contends that the exclusive listing agreement he entered into with Glenlakes Realty in November 1991 included the LGCC. He says that the property description in the listing agreement describing 820 acres was the same that was used in an earlier Wall Street Journal advertisement that first brought the property to the attention of Yarborough, Gorrie, and Murray, and that a marketing plan prepared subsequent to the listing agreement also listed the entire property as containing 820 acres. Thus, he argues that the use of the description "820 acres" meant that the LGCC was included in the exclusive listing agreement. Norwood further notes that the exclusive listing agreement was signed for Glenlakes Realty by Harry Watkins, the general manager, who had authority to bind the company and who testified at trial that he understood the listing agreement to include the LGCC. He notes that Watkins also testified that he would not have signed the listing agreement *Page 179 
if Yarborough, Gorrie, and Murray had not agreed to it.
Norwood argues that the defendants are wrong in their contention that he drafted the property description in the listing agreement and in their argument that any ambiguity, therefore, should be construed against him. Norwood notes that Watkins testified that the description was jointly drafted by Norwood and Watkins, who represented Glenlakes Realty. Thus, Norwood says that the property description in the listing agreement cannot be construed against him and that it should be interpreted to include the LGCC. Norwood argues that he is due payment of a commission in relation to the sale of the LGCC to LinksCorp because, he says, the sale agreement between Glenlakes Realty and LinksCorp was negotiated in June 1993, during the existence of his sales authority.
Norwood next argues that the first listing agreement was extended by implication past January 1, 1993, because the parties to the agreement, Norwood and Glenlakes Realty, continued their respective performances after the expiration date. Specifically, Norwood argues that after the express contract expired it was replaced with an implied one that, he says, encompassed the terms of the written agreement, and he argues that the existence of this agreement is at least a question of material fact precluding a preverdict JML on his breach of contract claim. He says that any necessity of putting an extension of the listing agreement in writing was waived by the defendants' acceptance of his continuing performance under the terms of the listing agreement. Norwood further argues that the second nonexclusive listing he signed with Glenlakes Realty in June 1993 did not terminate the implied extension of the first listing agreement, because, he says, the two do not cover the same subject matter. However, he contends that if the second listing agreement terminated the implied extension of the first, then the 180-day provision in the first listing agreement encompasses the sale of the LGCC.
Alternatively, Norwood argues that an additional express contract extended the terms of the November 1991 exclusive listing agreement. He says that after January 1, 1993, he was told by the defendant Murray that Norwood's "deal" with Glenlakes Realty was fine with Yarborough, Gorrie, and Murray. Norwood contends that a contract between a seller of real estate and a broker need not be in writing and, thus, he says that there was at least a question of material fact as to whether an oral contract was formed that gave him a second express listing agreement after January 1, 1993.
Having reviewed the November 1991 exclusive listing agreement between Glenlakes Realty and Norwood, we conclude that the property description is ambiguous. Although the first portion of the descriptive sentence appears to mention the LGCC as merely a reference point, its later mention of 820 acres creates doubt as to whether the parties intended to include the LGCC in the property description. Although the defendants contend that Norwood drafted the property description, and thus that any ambiguity should be construed against him, Watkins testified at trial that the description was jointly drafted by Norwood and Watkins, who represented Glenlakes Realty. Thus, we cannot construe any ambiguity in the description against Norwood and we cannot say that as a matter of law the description did not include the LGCC. When a contract is ambiguous, the meaning of the contract is to be determined by the trier of fact. MassAppraisal Services, Inc. v. Carmichael, 404 So.2d 666
(Ala. 1981); Jones v. Chaney James ConstructionCo., 399 F.2d 84 (5th Cir. 1968).
Even though the meaning of the property description in Norwood's exclusive listing agreement was properly to be determined by the jury, that fact is not conclusive on the issue whether the trial court erred in denying the defendants' motions for a preverdict JML and a post-verdict JML. Even if the exclusive listing agreement is read to include the LGCC, we conclude that Norwood failed to present substantial evidence indicating that he met the requirements set out in the agreement for him to receive a commission on the sale of the LGCC. In other words, it can be determined, as a matter of law, that Norwood failed to tender the *Page 180 
performance necessary to meet the terms of the contract.
Specifically, Norwood would have had to list LinksCorp, the eventual purchaser of the LGCC, with Glenlakes Realty as a prospective purchaser of the LGCC, before January 1, 1993. It is uncontroverted that he did not do so. Moreover, the sale needed to occur within 180 days of January 1, 1993, and we conclude that, as a matter of law, the earliest it could be held that a sale of the LGCC occurred was September 1, 1993, when a purchase agreement between LinksCorp and Glenlakes Realty was executed.[2] Thus, we conclude that, as a matter of law, the prerequisites necessary for Norwood to receive a sales commission were not met.
Moreover, we also conclude that Norwood failed to present substantial evidence in support of his claims based on an implied extension of the exclusive listing agreement and a separate oral listing agreement. In sum, we conclude that the trial court erred in denying the defendants' pre-verdict JML motion and post-verdict JML motion on Norwood's breach of contract claim.
 III.
Having concluded that Norwood failed to present substantial evidence in support of his breach of contract claim, we also hold that he failed to present substantial evidence in support of his claims that the defendants fraudulently misrepresented that he was not due a commission on the sale of the LGCC, that the defendants fraudulently suppressed that he was due a sales commission, that the defendants tortiously interfered with his exclusive listing agreement, and that the defendants wrongfully conspired to deprive him of his right to a sales commission under the listing agreement. Those claims are all dependent upon the viability of Norwood's breach of contract claim, and, because we have concluded that the trial court erred in denying the defendants' motions for a pre-verdict JML and for a post-verdict JML on the breach of contract claim, we must also conclude that the court erred in denying the motions for a pre-verdict JML and for a post-verdict JML on those claims as well.
However, we conclude that Norwood did present substantial evidence in support of his claim for a quantum meruit recovery in relation to the work he performed for Glenlakes Realty after Watkins was terminated from the position as manager. There is substantial evidence indicating that Norwood was not compensated for that work or was insufficiently compensated for it, although he did receive a residential lot from Glenlakes Realty that may be valued at $13,000 or more. See Hendrix, Mohr Yardley, Inc. v. City of Daphne, 359 So.2d 792, 795 (Ala. 1978) ("It is the settled law of this State that where one knowingly accepts services rendered by another, and the benefit and result thereof, the law implies a promise on the part of the one accepting . . . to pay the reasonable value of [the] services rendered.") It is for the jury to determine the factual questions whether Glenlakes Realty was due to compensate Norwood for his additional work, whether Glenlakes conveyed the residential lot to Norwood as compensation for that work, and, if so, whether the conveyance of that property was sufficient compensation. Accordingly, the trial court properly denied the defendants' motions for a pre-verdict JML or a post-verdict JML as to this claim.
 IV.
Having concluded that the trial court erred in denying the defendants' motions for a pre-verdict JML or a post-verdict JML as to Norwood's claims alleging breach of contract, fraudulent misrepresentation, fraudulent suppression, tortious interference with contract, and conspiracy, we reverse the trial court's judgment based on the jury's general *Page 181 
verdict. We remand this cause for a new trial on the quantum meruit claim.
REVERSED AND REMANDED.
HOOPER, C.J., and MADDOX, ALMON, HOUSTON, KENNEDY, COOK, and SEE, JJ., concur.
[1] Effective October 1, 1995, Rule 50, Ala. R. Civ. P., was amended to rename motions for directed verdict and motions for judgment notwithstanding the verdict as motions for judgment as a matter of law ("JML"). We will use the amended terminology and, so as to facilitate differentiation between a motion made at the conclusion of the plaintiff's case or at the conclusion of the evidence, on the one hand, and a motion made after the return of a verdict, on the other hand, we will use the limiting term "pre-verdict" or "post-verdict," as appropriate.
[2] Although Norwood argues that the terms of the June 1993 letter of intent are substantially the same as those of the September 1993 purchase agreement and thus argues that it should be held that there was a sales agreement in June, an agreement to later enter into an agreement is not enforceable,Dixieland Food Stores, Inc. v. Geddert, 505 So.2d 371
(Ala. 1987); Clanton v. Bains Oil Co.,417 So.2d 149 (Ala. 1982). Thus, the letter of intent cannot constitute a "sale" of the LGCC.
Editor's Note: The opinion of the Supreme Court of Alabama, in R.B.Z. v. Warwick Development Company, published in the advance sheet at this citation,721 So.2d 181-184, was withdrawn from the bound volume and will be re-published along with a related order.