2 So.3d 847 (2008)
Terry Elizabeth DENSON
v.
Virginia MOSES.
2070140.
Court of Civil Appeals of Alabama.
May 2, 2008.
*848 Robert H. Brogden, Ozark, for appellant.
Bryant F. Williams, Jr., Ozark, for appellee.
MOORE, Judge.
This is a will-contest action. Robert Moses ("Moses"), the testator, died on September 17, 1999. His wife, Virginia Moses ("Virginia"), proffered Moses's will for probate. Moses's only child, Terry Elizabeth Denson, filed an action contesting the will and challenging Moses's testamentary capacity to execute that will. The action was removed to the circuit court. Denson's challenge was heard before a jury but, before the action was submitted to the jury for consideration, the circuit court entered a judgment as a matter of law in favor of Virginia.
Denson appealed to the Alabama Supreme Court; that court transferred the appeal to this court, pursuant to § 12-2-7(6), Ala.Code 1975. On appeal, Denson argues that Moses lacked testamentary capacity at the time he executed the proffered will. We reverse.

Background
Moses and Virginia married in January 1999. Moses executed a will in March 1999; he died in September 1999. After Moses's death, Virginia offered Moses's will for probate. Under the terms of that proffered will, Virginia was named as the executrix of Moses's estate and as the sole beneficiary of his estate. Denson was not mentioned in the will.
At the trial in this matter, the following witnesses testified: Dr. Calvin Reid, Moses's treating physician; Denson; and David Hogg, the attorney who drafted the will for Moses. Copies of Moses's medical records were also introduced into evidence.
The medical records introduced at the trial established that Moses had experienced some health issues during the 10 years before his death. In December 1992, Moses had been admitted to the hospital; at that time he was comatose, in critical condition, and was not expected to live. Physicians initially believed that he had suffered a stroke.
It was later discovered that Moses had not suffered a stroke but was suffering from renal failure due to untreated prostate cancer. He underwent surgery for the cancer. Because of the seriousness of his condition during that 1992 hospitalization, *849 the hospital had contacted Denson as Moses's next of kin. It was undisputed that Moses and Denson had had a strained relationship for many years. According to Denson, upon arriving in Alabama to tend to Moses, she discovered that his home was in "awful" condition. She described dead mice around his bed, old food in the refrigerator, and bare dirt floors where bricks had once been. According to Denson, she had done some work at Moses's home to make it livable and safe.
Denson acknowledged that, because of the severity of Moses's medical condition, she had obtained a conservatorship over him. As a result of that conservatorship, Denson had withdrawn more than $60,000 of Moses's money from his bank account and had closed that account, moving the money into a conservatorship account. Denson also had taken control of approximately $60,000 in cash from Moses's home; according to Denson, she had taken Moses's money from his home because she had discovered Fred Plumb and his wife in Moses's home with the safe open; Moses kept the cash in that safe.
Moses fully recovered from his cancer, and he was discharged from the hospital on December 28, 1992. He returned to his normal lifestyle, caring for his horses. Denson testified that, after Moses had recovered, she had returned all the money to him. However, she admitted that Moses might have believed that she did not return all his money to him. Denson acknowledged that Moses had been unhappy about her taking control of his life in 1992 and that "he never got over it."
In November 1995, Moses was again hospitalized and underwent surgery for bleeding duodenal ulcers. According to Dr. Reid, Moses had suffered a brief bout of delirium after this surgery. Dr. Reid believed that Moses's delirium possibly resulted from developing dementia, from a cognitive decline, or from changes consistent with Alzheimer's disease. The medical records from this hospitalization, however, made no mention of this delirium. Upon his discharge from the hospital, Moses again resumed his daily routine.
In late 1997 and early 1998, Dr. Reid reported that Moses's prostate-specific antigen ("PSA") levels were dramatically increasing, indicating to Dr. Reid that Moses's prostate cancer was recurring.[1] Dr. Reid scheduled an appointment with a urologist for Moses. Moses, however, failed to appear for that appointment. Dr. Reid made other appointments for Moses, but Moses failed to keep those appointments as well. This caused Dr. Reid concern regarding Moses's state of mind because, although it appeared that Moses's cancer had recurred, Moses was failing to see a specialist on that matter. However, Dr. Reid acknowledged that Moses had never been reliable regarding medical visits and had often failed to show up for scheduled appointments.
Dr. Reid again saw Moses in November 1998. Dr. Reid next saw Moses in April 1999, the month following the execution of his will. Virginia accompanied Moses on that visit, and during that visit Dr. Reid learned that they had married. Virginia assured Dr. Reid that Moses would take care of himself and see to his medical needs. The medical records indicate that, by July 1999, Moses had undergone radiation for recurrent prostate cancer. Despite that treatment, Moses died on September 17, 1999.
*850 At the trial, Dr. Reid admitted that he had detected no neurological deficiencies in Moses as of October or November 1998 and that he had not seen Moses again until the April 1999 visit. Because he had had no interaction with Moses during the month of March 1999, Dr. Reid admitted that he could not form an opinion as to Moses's mental state on the day he had executed his will. Dr. Reid also acknowledged that it was typical of Moses not to keep scheduled doctor appointments.
Dr. Reid also admitted that, as of March 9, 1999, Moses would have known who Virginia and Denson were and how he felt about each of them. Dr. Reid also agreed that, in March 1999, Moses would have been able to understand that he was making a will and to understand that, as a result of that will, he was leaving his assets to Virginia rather than to Denson.
However, the following exchanges occurred without objection during Dr. Reid's testimony at the trial:
"Q. [Counsel for Denson:] Do you have an opinion back on March 9 of 1999 whether or not [Moses] would have had the competency to understand the nature and the consequences of the business to be performed when he was executing a will?
"A. [Dr. Reid:] It would be my opinion that he did not have the insight into making those decisions.
". . . .
"Q. [Counsel for Virginia:] Do you know on March 9 of 1999 whether or not Mr. Robert Moses knew what his estate consisted of?
"A. [Dr. Reid:] I don't know for sure, but I would question at this point if he knew what his estate consisted of."
According to Denson, Moses had told her on several occasions during 1999 that he was going to take care of Denson and her children. Denson testified that Moses had waited for some time to tell her that he had married Virginia and that he had never told her that he had executed a will. Denson claimed that after his hospitalizations, Moses had appeared to be "a totally different person." She claimed that he had repeated stories during the same visit, had been weaker than before, and had been frustrated that he could no longer care for his horses.
Denson also testified that Moses was a stickler for details but that he had signed a will containing multiple errors. She pointed out that the will had erroneously indicated that Moses lived in Houston County when he lived in Dale County. The will had referenced "my pickup truck" when, at the time of his death, Moses owned three pickup trucks. Denson also pointed out that the will had not specifically referenced a substantial number of savings bonds Moses held at the time of his death. She also asserted that the will had made no mention of Moses's horses, his most prized possessions. Denson also alleged that Moses did not typically sign his name as it was shown on the will.
David Hogg, an attorney, testified that he had met with Moses and Virginia regarding Moses's request to draft a will. Hogg remembered that Moses had wanted to leave all of his estate to his wife, Virginia, and that he specifically had not wanted his child, Denson, to receive any of his estate. Hogg noticed nothing out of the ordinary about Moses and Virginia, and, in Hogg's opinion, Moses appeared to be acting normally. Hogg testified that Moses had been absolutely capable of executing a will at that time. Regarding the errors in the will as to Moses's county of residence and the form of his name, Hogg testified *851 that he had simply not done a very thorough job of proofreading the will.[2] Hogg also testified that, in preparing wills, he typically did not list all the testator's property and assets in the will, particularly when a testator wished to leave his entire estate to one person.

Standard of Review
"`The standard of review applicable to a motion for directed verdict or judgment notwithstanding the verdict [now referred to as a preverdict and a postverdict motion for a judgment as a matter of law] is identical to the standard used by the trial court in granting or denying the motions initially. Thus, when reviewing the trial court's ruling on either motion, we determine whether there was sufficient evidence to produce a conflict warranting jury consideration. And, like the trial court, we must view any evidence most favorably to the nonmovant."'
Glenlakes Realty Co. v. Norwood, 721 So.2d 174, 177 (Ala.1998) (quoting Bussey v. John Deere Co., 531 So.2d 860, 863 (Ala.1988)).

Analysis
Section § 38.04 of the Alabama Pattern Jury Instructions provides:

"MENTAL CAPACITY-DEFINITION
"The law presumes that every person of legal age has sufficient mental capacity to make a valid will.
"A person may be feeble, weakminded or capricious and still have (mental) (testamentary) capacity to make a will if he is able to have a decided and rational desire as to the disposition of his property.
"The court will now define what is required to have the mental capacity to make a will, which is known as testamentary capacity.
"The testator must have at the time of the execution of the will memory of mind sufficient to recall and understand:
"1. The property he is about to bequeath or devise.
"2. The objects of his bounty.
"3. The disposition he desires to make of his property.
"4. The nature and consequences of the business to be performed.

"5. The relation of these elements to each other."
2 Alabama Pattern Jury Instructions Civil § 38.04 (2d ed.1993) (emphasis added). See also Ex parte Helms, 873 So.2d 1139, 1147 (Ala.2003) ("`Simply stated, if the testator knows his estate and to whom he wishes to give his property and understands that he is executing a will, he has testamentary capacity. A person may execute a valid will, even if he or she is not competent to transact ordinary, everyday affairs.'" (quoting Smith v. Vice, 641 So.2d 785, 786 (Ala.1994))); Fletcher v. DeLoach, 360 So.2d 316 (Ala.1978); and Horton v. Rasberry, 852 So.2d 155 (Ala.Civ.App. 2002). The evidentiary standard to establish testamentary capacity is very low. Smith v. Vice, 641 So.2d at 786 (recognizing that the showing required to establish testamentary capacity is not a high one).
Despite the low evidentiary standard required to be met to establish testamentary capacity, we conclude that the conflicting evidence in this case was sufficient to raise a question for the jury on this issue. Hogg believed that Moses was competent to execute his will on March 9, *852 1999; in contrast, Dr. Reid's testimony, although equivocal, appeared to question Moses's competency as of that date. Dr. Reid expressly questioned whether on March 9, 1999, Moses had the "insight" to understand the nature and consequences of the business to be performed when he was executing a will. Dr. Reid also questioned whether at that point Moses would have known the contents of his estate. Dr. Reid also testified that Moses had previously experienced a bout of delirium, which, Dr. Reid believed, indicated that Moses was possibly experiencing a "cognitive decline or possible changes consistent with Alzheimer's."
In reviewing on appeal a judgment as a matter of law, we must view the evidence in a light most favorable to the nonmovant, in this case, Denson. Glenlakes Realty Co. v. Norwood, 721 So.2d at 177; Bussey v. John Deere Co., 531 So.2d at 863. When conflicting evidence as to one of more of the essential elements of the nonmovant's claim has been presented, a question of fact for the jury is presented. We, therefore, reverse the circuit court's judgment and remand the case for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
PITTMAN and THOMAS, JJ., concur.
BRYAN, J., concurs in the result, without writing.
THOMPSON, P.J., dissents, with writing.
THOMPSON, Presiding Judge, dissenting.
After reviewing the record, I conclude that Terry Denson failed to meet the burden required to submit the issue of Robert Moses's testamentary capacity to a jury. Accordingly, I must respectfully dissent.
"`An appellate court, when reviewing a ruling on a motion for a judgment as a matter of law, uses the same standard the trial court used initially in granting or denying the motion. Regarding questions of fact, the ultimate question is whether the nonmovant presented sufficient evidence to allow the case or the issue to be submitted to the jury for a factual resolution.... [T]he nonmovant must present "substantial evidence" in order to withstand a motion for a judgment as a matter of law. A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. In reviewing a ruling on a motion for a judgment as a matter of law, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw.'"
Jim Walter Homes, Inc. v. Nicholas, 843 So.2d 133, 135 (Ala.2002) (quoting Bell v. T.R. Miller Mill Co., 768 So.2d 953, 956 (Ala.2000)) (emphasis added).
The issue presented to the circuit court and to this court is whether Denson presented "substantial evidence" in support of her claim that Moses lacked testamentary capacity. Jim Walter Homes, Inc. v. Nicholas, supra. "Substantial evidence" is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989); see also § 12-21-12(d), Ala.Code 1975.
In discussing the requirements necessary to show testamentary capacity, our supreme court has explained:
"`The law presumes that every person has the capacity to execute a will, *853 and the burden is on the contestant to prove the lack of testamentary capacity. To possess testamentary capacity, one must be able to recall the property to be devised, the desired disposition of the property, and the persons to whom he or she wishes to devise the property. In Fletcher v. DeLoach, 360 So.2d 316 (Ala.1978), the Court described in detail the broad evidentiary inquiry that must be made when testamentary capacity is at issue:
"`"`Evidence is competent to prove conduct and language at various times and places indicating an unhealthy mental condition, and the more extensive the view the safer is the determination reached.'
"`"[Tucker v. Tucker, 248 Ala. 602, 610, 28 So.2d 637, 644 (1946).] Thus, evidence offered as to the mental and physical condition of the testatrix, either before or immediately after execution of the will, is admissible since it tends to indicate her condition when the will was signed. Likewise, testimony regarding the testatrix's `conversations, deportment, acts, and appearance' has been found to be competent on the issue of testamentary capacity."
"`360 So.2d at 318 (citations omitted).'
"Allen v. Sconyers, 669 So.2d 113, 117-18 (Ala.1995) (citations omitted and emphasis added).
"`Simply stated, if the testator knows his estate and to whom he wishes to give his property and understands that he is executing a will, he has testamentary capacity. A person may execute a valid will, even if he or she is not competent to transact ordinary, everyday affairs.'"
Ex parte Helms, 873 So.2d 1139, 1147 (Ala. 2003) (some emphasis in original; some emphasis added).
This court must presume, as did the circuit court, that Moses had testamentary capacity at the time he executed the will. Ex parte Helms, supra (citing Allen v. Sconyers, 669 So.2d 113 (Ala.1995)). In opposition to Denson's challenge, Virginia Moses ("Virginia") submitted the testimony of David Hogg, the attorney who drafted Moses's will. Hogg testified that during both occasions he dealt with Moses concerning the will, he believed Moses had testamentary capacity. Hogg also testified that he clearly remembered that Moses desired to execute a will that omitted his child, which tends to support Hogg's determination that Moses knew his estate, knew that he was executing a will, and knew to whom he desired to give his property. See Ex parte Helms, supra.
In attempting to defeat the presumption that Moses had testamentary capacity at the time he executed the will, Denson presented evidence that merely calls into question whether Moses had testamentary capacity at the time he executed the will. Dr. Calvin Reid, Moses's treating physician, expressed doubts as to whether Moses had testamentary capacity at the time he executed the will, but there was no direct evidence indicating that Moses actually lacked testamentary capacity at that time. Dr. Reid expressed concern that Moses possibly had experienced a cognitive decline or was in the early stages of Alzheimer's disease; however, Dr. Reid had not diagnosed Moses as having such a condition, nor did he have contact with Moses at the time Moses executed the will. At most, the evidence indicates that Moses had had a bout of delirium while receiving medical treatment in the hospital. I do not believe that the evidence was sufficient to call Moses's testamentary capacity at all *854 times after the period of delirium into question, much less to create a question of fact as to whether he possessed such capacity. An issue such as insanity or a cognitive decline should be shown to be a consistent and continuing condition in order to establish that that condition prevented the testator's ability to form the requisite level of testamentary capacity. Camp v. Dobson, 228 Ala. 32, 152 So. 38 (1934).
The burden is on the contestant to show a lack of testamentary capacity. Ex parte Helms, supra; Smith v. Vice, 641 So.2d 785, 786 (Ala.1994). Hogg's testimony, particularly his testimony pertaining to Moses's intention to omit Denson from his will, indicates that Moses had testamentary capacity when he executed the will. See Smith v. Vice, 641 So.2d at 787-88 ("The fact that, in a discordant family, a testatrix may perceive her daughter's actions in obtaining a lunacy warrant for her arrest as unfavorable, and accordingly will nothing to the daughter, simply does not indicate a lack of testamentary capacity."). By his own testimony, Dr. Reid admitted he did not know Moses's condition at the time Moses executed the will, and he "questioned" whether Moses had testamentary capacity at that time. However, speculation about Moses's capacity is not sufficient to create a factual question to submit to a jury. Sikes v. Jones, 686 So.2d 1202 (Ala.Civ.App.1996) (speculation concerning the cause of an injury was insufficient to warrant submitting the issue to a jury); Nelson v. Dunaway, 536 So.2d 955, 956 (Ala.Civ.App.1988) ("Evidence which affords nothing more than mere speculation, conjecture, or guess is insufficient to warrant submission of a case to a jury.").
I conclude that the circuit court properly refused to submit the issue of Moses's testamentary capacity to the jury and that it correctly entered a judgment as a matter of law in favor of Virginia. Therefore, I dissent.
NOTES
[1] According to Dr. Reid, PSAs are normally found in low levels in men but, when found in elevated levels, are a "marker" for cancer.
[2] Other evidence was introduced indicating that Moses had, in the past, signed his name in various ways on documents.