MOORE, Judge.
Ronnie Lamar Still and Sandra Gilliland (“the contestants”) appeal from a summary judgment entered by the Escambia Circuit Court (“the circuit court”) on their action contesting a will and seeking to set aside *847 certain inter vivos transfers. We affirm in part and reverse in part.

Procedural History

On December 3, 2008, BankTrust, formerly known as BancTrust Company, Inc. (“BankTrust”), filed a petition in the Es-cambia Probate Court to probate the will of John L. Still (hereinafter referred to as “Still” or “the decedent”). The decedent’s will directed that all the decedent’s property be conveyed to the John L. Still 2006 Revocable Trust (“the trust”). BancTrust Company, Inc., was named as the personal representative of the estate. BancTrust Company, Inc., was also named as the trustee of the trust. The trust was for the benefit of Still during his lifetime, with the remainder to be conveyed to the Greater Brewton Foundation (“the foundation”), a charitable organization, upon Still’s death. The probate court set a hearing on Bank-Trust’s petition to probate the will for January 6, 2009, and, on that day, it entered an order admitting the will to probate and an order granting letters testamentary to BankTrust.
On March 6, 2009, the contestants, Still’s niece and nephew, filed in the circuit court a complaint contesting the will and requesting that Still’s inter vivos transfers to the trust be set aside. The contestants alleged that Still had lacked testamentary capacity to make the will and that the will had been procured by undue influence. With regard to the inter vivos transfers, the contestants alleged, among other things, that Still had been of unsound mind when the transfers were made and that the transfers had been procured through undue influence.[1]
After BankTrust filed a motion for a more definite statement and that motion was granted, the contestants filed an amended complaint on June 5, 2009. In the amended complaint, the contestants specified that they were challenging the transfer of Still’s house to the trust by way of a deed executed on June 1, 2006, as well as “other inter vivos transfers.” Bank-Trust answered the complaint on June 18, 2009; it also counterclaimed for attorneys fees and costs, pursuant to §§ 12-19-272 and 43-8-196, Ala.Code 1975. On July 17, 2009, the contestants filed an answer to BankTrust’s counterclaim.
On March 22, 2010, BankTrust filed a motion for a summary judgment on all the contestants’ claims, as well as eviden-tiary materials in support of its motion. On May 19, 2010, the contestants filed a brief and evidentiary submissions in opposition to the summary-judgment motion. On May 28, 2010, the contestants filed a supplemental brief and evidentiary materials. That same day, BankTrust filed a letter brief in support of its summary-judgment motion. On June 29, 2010, the circuit court entered an order granting BankTrust’s summary-judgment motion as to the claims that were based on allegations of undue influence and denying BankTrust’s summary-judgment motion as to the claims that were based on allegations of Still’s lack of testamentary capacity and that he had been of unsound mind. On July 12, 2010, BankTrust filed a motion to reconsider the partial denial of its summary-judgment motion, along with supporting evidentiary submissions. On August 16, 2010, the contestants filed a brief in opposition to the motion to reconsider. On August 30, 2010, the circuit court entered a summary judgment on the contestants’ claims that were based on *848 allegations of Still’s lack of testamentary-capacity and that he had been of unsound mind. The circuit court specifically found that the testimony did not establish that Still had suffered from a permanent or chronic dementia so as to preclude his execution of the documents and that the contestants’ witnesses had not been present when Still executed the documents. On September 28, 2010, the contestants filed a “motion to reconsider” or for a new trial; that motion was denied on November 15, 2010.[2] The contestants filed their notice of appeal to the Alabama Supreme Court on December 20, 2010; that court transferred the appeal to this court, pursuant to § 12-2-7(6), Ala.Code 1975, on January 3, 2011.

Facts

Before his retirement, Still was a loan officer for BancTrust Company, Inc. Raymond F. Lynn, Jr., a trust officer for BankTrust, testified in his affidavit that, in April 2006, Still contacted him to discuss his financial affairs, including his need for a trust. Lynn stated that he and Christy A. Black, another trust officer for Bank-Trust, went to Still’s residence to discuss those matters. Lynn testified that Still decided to create a trust for his benefit during his lifetime. According to Lynn, they also discussed the need for a limited power of attorney so that the bank could transfer funds from Still’s individual retirement account (“IRA”) and sell assets to fund the trust as needed.
Lynn testified that he had asked Still what provision he wanted to make for the remainder of the trust after he died and that Still had stated that he had “done enough” for his family and that he wanted to leave it to charity. According to Lynn, they discussed various charities and Still indicated he was considering leaving a portion of his estate to his church. Lynn and Black both stated in their affidavits that Still had stated that his attorney, Everette Price, was seriously ill and that Still had therefore asked Lynn to contact Broox G. Garrett, Jr., an attorney whose firm had been local retained counsel for BankTrust, to draft the necessary documents. Lynn stated that he contacted Garrett, who agreed to meet with Still.
Lynn stated that he, Black, and Garrett met with Still in the latter part of April 2006. Garrett testified in his affidavit that he had a lengthy conversation with Still about his desire to establish a revocable trust with BankTrust as the trustee and to dispose of the remainder of his estate after his death. According to Garrett, Lynn, and Black, Still decided to leave the remainder of his estate to the foundation and not his church. Lynn stated that Still had directed Garrett to prepare trust documents and a will and that Still executed both the trust documents and the will on May 17, 2006. Lynn, Garrett, and Black were all present when Still executed the documents. Black notarized the documents, and Lynn and Garrett served as witnesses to the execution of the will. According to Garrett, at the direction of Still, he also drafted a deed conveying Still’s home to the trust and reserving a life *849 estate for Still. Black testified that Still executed the deed on June 1, 2006, and that she notarized the deed.
Lynn testified that Still had been his friend and colleague for over 30 years and that Still was of sound mind during all the discussions that were had about the trust and the disposition of his estate as well as when he executed the trust documents and the will. Lynn further testified that Still executed the trust documents and the will freely and without interference from any party. Black testified that she had worked with Still regularly for over five years. Specifically, she testified that she had managed an agency account for Still, which had been funded from his IRA from time to time to pay for certain expenses relating to his home. She testified that Still had handled all of his other financial matters himself and had also managed his own checking account. Black testified that Still was of sound mind at the time he executed all the documents and that he had done so voluntarily and with full knowledge of the contents of each document. Garrett testified that he had been acquainted with Still for approximately 35 years and that, during their discussions of the trust and the disposition of his estate, and at the time of the execution of the trust documents and the will, Still was of sound mind and executed the documents freely. Garrett further testified in his deposition that he went over the documents with Still in layman’s terms and that he had no doubt that Still understood the terms of the trust. Garrett also testified in his deposition that Still had stated that he had done all that he intended to do for his nieces and nephews.
Sandra Gilliland, Still’s niece, testified in her affidavit that she had known Still her entire life. She testified that, because she and Still had lived in the same town, they were especially close during the last years of Still’s life. Richard Gilliland, Sandra’s husband, testified that he also had been close to Still. According to Sandra and Richard, in 2001, Still was diagnosed with cancer and underwent brain surgery. Sandra and Richard testified that Still’s health and mind began to deteriorate at that time. They stated that Still’s condition was so dire that, beginning in early 2006, he was unable to live at home by himself, so he was placed in the “Holley House.”[3] Both Sandra and Richard stated that, from their personal observations, they did not believe that, on May 17, 2006, Still could have possibly been aware of and could have sufficiently recalled the extent of his property and other assets or the names and locations of his living relatives, and they did not believe that Still could have understood the nature and consequences of executing a will and complicated trust documents.
Riley Edwards testified in his deposition that he had met Still at BankTrust in the 1970s but that they did not become friends until a year or two after Edwards retired in April 2001. He testified that he, Still, and another man ate dinner at a Texas Roadhouse restaurant once a week. He testified that sometimes John David Finley would join them. He testified that, a couple of years after they became friends, Still became unable to order or to pay for his meal at the restaurant. He testified that a year or so before Still went to live at the Holley House, Still would forget that they were supposed to go eat even after *850 Edwards had called him and told him earlier that same day.
Edwards stated that Still had to go live at the Holley House because he could not remember what medications he was supposed to take and that, at the Holley House, Ms. Holley administered Still’s medications to him. He testified that, at the time he went to live at the Holley House, Still’s memory had gotten worse. Edwards testified that he visited or called Still twice a week at the Holley House. He testified that, from February 2006 until June 2006, Still’s mental and physical conditions worsened. He testified that Still’s mental condition was such that he did not believe that Still would have understood his financial affairs. He testified that there had been a few situations when he felt like people had taken advantage of Still with regard to business transactions. He testified that Still had told him that Black handled most of his bills. He testified that he did not think that Still would have had the ability to write his own checks, pay his own bills, and handle matters at his house. After counsel for Bank-Trust showed Edwards copies of checks written by Still, Edwards stated that Still would have written a check for whatever amount he was told to write and that it was his opinion that Still had lacked the ability to handle his financial affairs. He admitted, however, that he did not know what Still’s state of mind was on the date Still executed the will and the trust documents.
Edwards testified that, on one occasion, he went by the Holley House to visit Still and that there were two men there with Still. He testified that, when he went back to the house later, Still had stated that the men were from the bank and that they had been discussing something to do with his trust, but he was not sure what.
Alma Dailey testified in her deposition that she had known Still for most of his life. She testified that she had worked with Still at BankTrust and had remained friends with Still after he retired. She testified that, after the 2001 surgery, Still was disoriented and that his condition had deteriorated with time. She testified that he had been unable to find the cafeteria in the hospital to pick up his meals. She testified that people took advantage of Still with regard to his money.
Dailey testified that she saw Still regularly until he went to live at the Holley House and that she had seen him only twice after that. She testified that the first time she saw him at the Holley House was in the first several months after he went to live there and that, on that occasion, his mental condition was no better and he did not seem capable of handling his affairs competently or of understanding to whom he wanted to leave his estate. She testified that, in her opinion, Still would probably have agreed to anything and that he was easily swayed and easily coached in a certain direction.
Dailey testified that Still had told her that Finley had asked him about leaving his estate to the foundation and that Still had told her that he was not interested in doing that because his attorney, Price, had already drafted his will. She testified that Still had told her that he wanted Sandra to have his house. She later testified that he had told her that he wanted Sandra to have all that he had.
Dailey admitted that she did not know what Still’s intentions were with regard to his estate in May 2006 and that there were times when his mental state was worse than at other times. She testified, however, that she would question whether, during February 2006 and May 2006, Still knew what he was doing. She testified that there was no way Still would have had *851 the mental capacity to process the trust documents in April 2006.
Still’s medical records indicate that Still was seen on January 18, 2006, by Dr. Gary E. Gerhard, a neurologist at the Medical Center Clinic, for difficulties with his gait and mentation. Dr. Gerhard noted that Still was oriented to his name, the date, and the last three presidents of the United States. He also noted, however, that Still could not subtract 7 from 100, that he could not remember the names of some of his medications, and that he was a poor historian. He further noted that Still could not recall any of three items after three minutes and that he had difficulty in initially understanding the request. Still was seen again on January 25, 2006, and, again, he was unable to subtract 7 from 100 and could not recall the names of any of his medications. Dr. Gerhard noted that the “differential” diagnosis included multiple small strokes and multi-farct gait apraxia and dementia.
Dr. Roman Kesler, a neurologist who practices in the group at the Medical Center Clinic, testified in his deposition regarding his review of Dr. Gerhard’s notes. Dr. Kesler testified that the January 18, 2006, note about issues with mentation could mean anything from behavior to mood to memory but that the fact that Still did not remember three items after three minutes was suggestive of a problem with short-term memory. Based on his review of the notes, Dr. Kesler testified that Still was having some issues with thinking and cognition and that it appeared the major problem was dementia. Dr. Kesler testified that, by January 25, 2006, Dr. Gerhard’s diagnosis of Still was that he had a degenerative organic brain disorder related to dementia. He testified that Still’s problems were to the point that Dr. Gerhard included dementia as a diagnosis. Dr. Kesler testified that the condition that Still was in at that time typically progresses.
Dr. Kesler testified that it could be difficult for someone to understand the mental acuity of a person with Still’s diagnosis if that person had limited contact with the patient and that it would not be unusual for someone not to notice that the patient was having mental-acuity issues. He also testified that the diagnosis of dementia did not mean that Still had been rendered incompetent. He also testified that Still could have been perfectly lucid on certain occasions. He testified that, if Still had been totally incompetent, Dr. Gerhard would have made a referral for a guardian or a competency proceeding and that it did not appear that he had done so. He testified that there was nothing in Dr. Ger-hard’s medical records to cause him to say that, with a reasonable degree of medical certainty, Still lacked the capacity to execute a deed or a will three months after the date of the medical records.

Standard of Review

“ ‘A summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. The burden is on the moving party to make a prima facie showing that there is no genuine issue of material fact and that it is entitled to a judgment as a matter of law. In determining whether the movant has carried that burden, the court is to view the evidence in a light most favorable to the nonmoving party and to draw all reasonable inferences in favor of that party. To defeat a properly supported summary judgment motion, the nonmoving party must present “substantial evidence” creating a genuine issue of material fact — “evidence of such weight and quality that fair- *852 minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” Ala.Code 1975, § 12-21-12; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989).’
“Capital Alliance Ins. Co. v. Thorough-Clean, Inc., 689 So.2d 1349, 1850 (Ala.1994). Questions of law are reviewed de novo. Alabama Republican Party v. McGinley, 893 So.2d 337, 342 (Ala.2004).”
Pritchett v. ICN Med. Alliance, Inc., 938 So.2d 933, 935 (Ala.2006).

Discussion

I.
On appeal, the contestants first argue that the circuit court erred in entering a summary judgment on the will contest because, they say, there was a genuine issue of material fact regarding whether Still possessed testamentary capacity at the time he executed the will.[4]
“Section § 38.04 of the Alabama Pattern Jury Instructions provides:
“ ‘MENTAL CAPACITY-DEFINITION
“ ‘The law presumes that every person of legal age has sufficient mental capacity to make a valid will.
“‘A person may be feeble, weak-minded or capricious and still have (mental) (testamentary) capacity to make a will if he is able to have a decided and rational desire as to the disposition of his property.
“ ‘The court will now define what is required to have the mental capacity to make a will, which is known as testamentary capacity.
“‘The testator must have at the time of the execution of the will memory of mind sufficient to recall and understand:
“‘1. The property he is about to bequeath or devise.
“ ‘2. The objects of his bounty.
“‘3. The disposition he desires to make of his property.
“ ‘4. The nature and consequences of the business to be performed.
“ ‘5. The relation of these elements to each other.’
“2 Alabama Pattern Jury Instructions Civil § 38.04 (2d ed. 1993) (emphasis added). See also Ex parte Helms, 873 So.2d 1139, 1147 (Ala.2003) (“‘Simply stated, if the testator knows his estate and to whom he wishes to give his property and understands that he is executing a will, he has testamentary capacity. A person may execute a valid will, even if he or she is not competent to transact ordinary, everyday affairs.” ’ (quoting Smith v. Vice, 641 So.2d 785, 786 (Ala.1994))); Fletcher v. DeLoach, 360 So.2d 316 (Ala.1978); and Horton v. Rasberry, 852 So.2d 155 (Ala.Civ.App.2002). The evidentiary standard to establish testamentary capacity is very low. Smith v. Vice, 641 So.2d at 786 (recognizing that the showing required to establish testamentary capacity is not a high one).”
Denson v. Moses, 2 So.3d 847, 851 (Ala.Civ.App.2008).
*853 “In Fletcher v. DeLoach, 360 So.2d 316 (Ala.1978), the Court described in detail the broad evidentiary inquiry that must be made when testamentary capacity is at issue:
“ ‘ “Evidence is competent to prove conduct and language at various times and places indicating an unhealthy mental condition, and the more extensive the view the safer is the determination reached.”
‘“[Tucker v. Tucker, 248 Ala. 602, 610, 28 So.2d 637, 644 (1946).] Thus, evidence offered as to the mental and physical condition of the testatrix, either before or immediately after execution of the will, is admissible since it tends to indicate her condition when the will was signed. Likewise, testimony regarding the testatrix’s “conversations, deportment, acts, and appearance” has been found to be competent on the issue of testamentary capacity.’
“360 So.2d at 318 (citations omitted). The Fletcher Court also noted that the reasonableness of a will’s provisions, when considered in light of the state of family relationships, may reflect on the testatrix’s capacity to recall the objects of her bounty.”
Allen v. Sconyers, 669 So.2d 113, 117-18 (Ala.1995).
“<“[T]he burden is on the contestant to show incapacity at the time the will was made and insanity prior to that time, unless of a permanent character, raises no presumption of insanity at the time the will was made.” ’
“Fletcher [v. DeLoach ], 360 So.2d [316,] 318 [ (Ala.1978) ], quoting King v. Aird, 251 Ala. 613, 617, 38 So.2d 883, 887 (1949). Accordingly, the burden ‘can only be discharged or shifted by showing prior habitual or fixed insanity, or actual insanity, or other incapacity at the date of the instrument.’ Eastis [v. Montgomery ], 95 Ala. [486,] 494, 11 So. [204,] 211 [ (1892) ].”
Smith v. Vice, 641 So.2d 785, 786-87 (Ala.1994).
The contestants cite Denson v. Moses, 2 So.3d at 851, and Ex parte Helms, 873 So.2d 1139 (Ala.2003), in support of their argument that there is a genuine issue of material fact on the issue of testamentary capacity. In Denson, this court held that there was a genuine issue of material fact as to testamentary capacity based on the equivocal testimony of the doctor questioning the testator’s competency although the attorney who had prepared the will testified that the testator was capable of executing the will. In Ex parte Helms, the evidence indicated that the testator had consumed Lortab, a prescription pain medication, before and after the date she executed her will, and that consuming Lortab affected the testator’s mental ability. 873 So.2d at 1145-46. The Alabama Supreme Court held that that evidence was sufficient to rebut the legal presumption in favor of the testator’s testamentary capacity and to create a genuine issue of fact. 873 So.2d at 1147-48. The supreme court noted that, although the proponents of the will testified that the testator appeared to be of sound mind, that conflicting evidence did not eliminate the question of fact. 873 So.2d at 1148.
We agree with the contestants that the holdings in Denson and Helms mandate a reversal in this case. In the present case, Sandra and Richard testified that Still’s mental condition had deteriorated such that they did not believe that Still could have possibly been aware of and could have sufficiently recalled the extent of his property and other assets or the names and locations of his living relatives on May 17, 2006, and that they did not *854 believe that Still could have understood the nature and consequences of executing a will and the complicated trust documents. Edwards testified that Still’s mental state had declined so much that he could not remember how to order a meal at a restaurant and could not pay his bill without assistance. Dailey testified that Still did not seem capable of handling his affairs competently or of understanding to whom he wanted to leave his estate. Further, although Dr. Kesler could not testify to a degree of medical certainty that Still lacked the capacity to execute a deed or a will three months after the date of the medical records, the medical records indicated that Still was having significant memory problems and had been diagnosed with dementia. Dr. Kesler testified that dementia typically does not improve but that, in fact, it worsens over time.
Based on Denson and Helms, we conclude that the foregoing evidence was sufficient to rebut the presumption that Still possessed testamentary capacity. Although Lynn, Black, and Garrett testified that Still was of sound mind when he executed the will, that testimony does not eliminate the issue of fact, the resolution of which is for a jury. We also note that the fact that Still’s will provided for a different distribution than what Still had previously represented to Dailey was his intention could be considered by the jury in determining whether he possessed testamentary capacity. See Allen, 669 So.2d at 117.
BankTrust cites Sanders v. Brooks, 611 So.2d 336 (Ala.1992), in support of its position that the trial court did not err in entering a summary judgment in its favor. In Sanders, the supreme court held that the trial court had not erred in granting the proponents of a will a new trial. The supreme court reasoned:
“The testimony of [the testator’s neighbor] and [the doctor who examined the testator] merely establishes that [the testator] was in mental decline; it does not prove that she was in dementia at the time she planned and executed her will. [The attorney who drafted the will] and his secretary were the only witnesses who actually observed [the testator] during this period; thus, their testimony must be afforded greater weight.”
611 So.2d at 338.
Sanders is distinguishable from the present case, however, because several witnesses in the present case specifically testified that Still lacked the capacity to make a will, not just that Still was in a mental decline. The supreme court made it clear in Allen, 669 So.2d at 117-18, that the testimony of the attorney who drafts a will is valuable evidence but that it must be weighed against all the other evidence, which is the responsibility of the jury. Thus, even considering Sanders, we conclude that a fact issue exists on the issue of testamentary capacity.
Based on the foregoing, we reverse the judgment of the circuit court on the will contest with regard to issue of testamentary capacity.
II.
The contestants next argue that the circuit court erred in entering a summary judgment on their will contest and their request to set aside the inter vivos transfers because, they say, they submitted sufficient evidence to establish a presumption of undue influence and because there is a genuine issue of material fact as to whether Still was subjected to undue influence.
“A presumption of undue influence arises when: (1) there is a confidential relationship between a favored beneficiary and the testator, (2) the influence of the beneficiary is dominant and controlling *855 in that relationship, and (3) there is undue activity by the beneficiary in procuring the execution of the will.” Hayes v. Apperson, 826 So.2d 798, 802 (Ala.2002). “In proving undue influence with respect to a deed, one needs to demonstrate only the first two elements of undue influence: (1) that a confidential relationship existed between the donor and the beneficiary, and (2) that the beneficiary has exercised a dominant and controlling influence over the donor.” Id. at 805.
In the present case, the beneficiary of the will and the deed is the foundation. We note, however, that there is no evidence indicating that a confidential relationship existed between Still and the foundation or that the foundation exercised a dominant and controlling influence over Still. Additionally, with regard to the will, there is no evidence indicating that the foundation conducted any undue activity in procuring the execution of the will. Accordingly, it is clear that the contestants have failed to prove the necessary elements of undue influence, and, thus, we conclude that the circuit court did not err in entering a summary judgment with regard to the contestants’ claim of undue influence.
The contestants argue that because the will named BankTrust as the personal representative and the trust named Bank-Trust as the trustee, BankTrust can be considered a beneficiary of the will and the deed. As BankTrust points out in its brief to this court, however, the contestants fail to cite any law in support of their argument. “ ‘When an appellant fails to cite any authority for an argument on a particular issue, this Court may affirm the judgment as to that issue, for it is neither this Court’s duty nor its function to perform an appellant’s legal research.’ ” Hall v. Hall, 903 So.2d 78, 80 (Ala.2004) (quoting City of Birmingham v. Business Realty Inv. Co., 722 So.2d 747, 752 (Ala.1998)).

Conclusion

Based on the foregoing, we reverse the judgment of the circuit court to the extent that it entered a summary judgment in favor of BankTrust on the will contest on the issue of testamentary capacity, and we remand this cause for further proceedings. We affirm the judgment in all other respects.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
THOMPSON, P.J., and PITTMAN, BRYAN, and THOMAS, JJ, concur.

. The contestants also filed a request to transfer the will-contest proceedings to the circuit court. As noted previously, the will contest had already been filed in the circuit court. The circuit court apparently treated that request as a petition to remove the administration of the estate to the circuit court, and it granted that request on March 19, 2009.

. In the order denying the contestants’ post-judgment motion, the trial court purported to certify its judgment as final pursuant to Rule 54(b), Ala. R. Civ. P. We note that because the only claim still pending was BankTrust’s counterclaim seeking attorney fees and costs pursuant to §§ 12-19-272 and 43-8-196, Ala. Code 1975, that certification was unnecessary. See Blankenship v. Blankenship, 963 So.2d 112, 114 n. 2 (Ala.Civ.App.2007) ("[A]n unadjudicated claim for an attorney’s fee does not affect the finality of a judgment.”); and McGough v. G & A, Inc., 999 So.2d 898, 903 (Ala.Civ.App.2007) (”[T]he failure of a trial court to specifically reserve jurisdiction over [Alabama Litigation Accountability Act] claim in a summary-judgment order impliedly disposes of the claim.”).

. The record does not indicate what the "Holley House” is; we assume that it is an assisted-living facility or nursing home. It appears from the record that all discussions regarding, as well as 'the execution of, the will, the trust documents, and the deed took place at the Holley House.

. As noted previously, the contestants also asserted in the trial court that Still was of unsound mind and therefore lacked the capacity to make the inter vivos transfers. The contestants have not, however, made any argument as to this issue on appeal; therefore, we consider that issue waived. Sexton v. Bass Comfort Control, Inc., 63 So.3d 656, 664 (Ala.Civ.App.2010) (" ‘ "An argument not made on appeal is abandoned or waived.” ’ ” (quoting Muhammad v. Ford, 986 So.2d 1158, 1165 (Ala.2007), quoting in turn Avis Rent A Car Sys., Inc. v. Heilman, 876 So.2d 1111, 1124 n. 8 (Ala.2003))).