Nationwide Mutual Fire Insurance Company ("Nationwide"), the defendant below, appeals from a judgment in favor of the plaintiffs Sandra P. Pabon and Khaldoon Barakat, husband and wife. We reverse and remand with directions.
 Background
Sandra P. Pabon is a native of Colombia, South America. Pabon graduated from high school in Colombia; she then moved to England, where she studied English. Pabon then moved to Gadsden where she attended Gadsden State Junior College. While in Gadsden, she worked as a translator. She speaks Spanish, English, and French. She is married to Khaldoon Barakat, whom she met while she was a student at Gadsden State. Barakat was born in Jerusalem and raised in Kuwait. He is a United States citizen and is working on a Ph.D. in computational chemistry.
On March 6, 1996, Pabon applied at the office of Nationwide agent Nancy Davis for homeowner's insurance. Davis asked Pabon questions to obtain the information necessary to complete the application. Davis completed the application on a computer screen, printed the completed application, and handed the paper printout to Pabon for her review and signature. Pabon signed the application. Directly above Pabon's signature was the following statement:
 "I hereby declare that the facts stated in the above application are true and request the company to issue the insurance and any renewals thereof in reliance thereon." *Page 761 
Based on this application, Nationwide issued an "Elite II" homeowner's insurance policy in the name of "Sandra P. Pabon or Barakat." This policy provided dwelling coverage of $101,000 and personal-property coverage of $70,700 for the house located at 3700 Greensport Road. The policy provided extended replacement-cost coverage for an additional premium.
On or about December 27, 1996, a fire occurred at the insured dwelling. All of Pabon and Barakat's belongings were destroyed, and their home was declared a total loss. Pabon filed a claim under the homeowner's policy. Nationwide advanced money to Pabon under the portion of the policy providing for additional living expenses and arranged for temporary living quarters for her family.
During its investigation of the fire, Nationwide learned of several inaccuracies on the insurance application. Although the application identified "Sandra P. Pabon or Barakat" as the insured, Nationwide learned that the Greensport Road property was deeded to Pabon's husband, Khaldoon Barakat, only.[1] Pabon had no ownership interest in the insured property. Additionally, although the application signed by Pabon indicated that neither Pabon nor any family member had filed a petition in bankruptcy within the previous seven years, Nationwide learned that Barakat was involved in a pending Chapter 13 bankruptcy proceeding when Pabon applied for the insurance and at the time of the fire. The application also indicated that neither Pabon nor any family member had been sued within the last seven years; however, Nationwide discovered that at the time the application was completed Barakat had been sued and that the litigation was pending at the time of the fire. The application also indicated no "past losses"; however, Nationwide discovered that Barakat had filed several claims under other insurance policies[2] and that he *Page 762 
also had previously filed a claim arising out of a fire occurring at a business location. Pabon admitted that she knew when she signed the application of her husband's bankruptcy filing, of his pending litigation, and of the previous insurance losses.
Additionally, on the application Pabon identified only one mortgage held against the property — a mortgage held by The Associates Financial Services Company, Inc. However, Joyce Owens, an individual, held a second mortgage against the property. Barakat, not Pabon, was shown as a mortgagor on both of the mortgages.
After the fire, Pabon and Barakat prepared "personal property inventory forms" and submitted them to Nationwide. On those forms, Pabon and Barakat itemized the personal property they claimed was destroyed in the fire. The personal property listed by Pabon and Barakat totaled $186,190.22.[3]
Nationwide authorized a "sifting" of the remains at the fire scene in an attempt to determine the contents of the dwelling at the time of the fire.[4] The results of the sifting did not correspond with the personal property inventory forms Pabon and Barakat submitted.[5] Pabon and Barakat claimed that Nationwide did not begin the sifting process until almost two months after the fire, although Nationwide's adjuster and attorney agreed as early as January 6, 1997, that a sifting was necessary. Pabon and Barakat complained that during this two-month period people and animals were able to access the fire scene and that their personal property was disappearing.[6]
Pabon and Barakat allege that despite their requests Nationwide did not secure the fire scene.
Pabon and Barakat submitted a "Sworn Statement and Proof of Loss" indicating that they had suffered a loss of $278,541.67, through January 31, 1997, as a result of the fire. The Associates, the first mortgagee, submitted a "Sworn Statement and Proof of Loss" claiming a loss of *Page 763 
$91,025.93. Joyce Owens, the second mortgagee, submitted a "Sworn Statement and Proof of Loss" claiming a loss of $17,918.28.
After Pabon's family had spent several weeks in a motel, Nationwide paid for Pabon, Barakat, and their daughter to move into an apartment. Nationwide also paid for Pabon and Barakat to rent furniture while they were living in this apartment. After six months, Pabon and her family relocated to another apartment. Nationwide did not cover the cost of renting this second apartment; Pabon and Barakat paid that rent themselves. Nationwide also discontinued paying the costs associated with renting furniture to furnish the apartment.
Pabon and Barakat each submitted to examinations under oath, as requested by Nationwide. On May 30, 1997, Nationwide notified Pabon and Barakat by mail that it would be filing a declaratory-judgment action seeking a determination whether Nationwide owed coverage under the policy issued to Pabon. However, before Nationwide filed its declaratory-judgment complaint, Pabon and Barakat filed their own action. On July 31, 1997, Pabon and Barakat sued Nationwide and Davis, alleging breach of contract, bad-faith failure to pay an insurance claim, breach of fiduciary duty, fraud, negligence, and negligent hiring, training, and supervision.
On October 1, 1997, Nationwide filed a counterclaim, seeking a judgment declaring whether the policy provided coverage for the losses.[7] Nationwide alleged that the policy did not provide coverage because of the material misrepresentations made by Pabon on the application for insurance coverage and misrepresentations made in connection with the claim itself. Nationwide requested a nonjury trial on the coverage issue.
Pabon and Barakat answered the counterclaim, asserting that Nationwide's agent, Davis, was responsible for the errors on the application because, they said, she acted negligently or recklessly in completing the application.[8] Pabon and Barakat also asserted that Nationwide's underwriting policy allowed it 60 days after an application for insurance is filed to investigate whether to accept or decline coverage. Pabon and Barakat argued that, if Nationwide had followed its own procedures, it would have discovered all of the erroneous information it claims was material to this risk. They argue that Nationwide either did not perform an investigation and thereby waived the right to decline coverage, or, if it performed an investigation, it obviously elected to accept Pabon's application for coverage.[9] Pabon and Barakat also claimed that, based on language in the policy, Nationwide *Page 764 
had waived its right to defend against a claim under the policy on the basis that the insurance application contained innocent but material misrepresentations. Finally, Pabon and Barakat argued that Nationwide acted negligently or recklessly in processing their claim.
On February 7, 2000, the trial court set Nationwide's declaratory-judgment counterclaim for a nonjury trial. Pabon and Barakat objected to the nonjury setting, noting that their breach-of-contract claim, on which they had requested a jury trial, was pending. After a hearing, the trial court overruled Pabon and Barakat's objection. On March 28, 2000, Pabon and Barakat filed a motion to reconsider their objection to the nonjury setting; that motion was denied on April 3, 2000.
On April 11, 2000, after a bench trial on Nationwide's declaratory-judgment counterclaim, the trial court entered its order declaring that Nationwide owed no coverage under the policy. That decision rendered moot Pabon and Barakat's breach-of-contract, bad-faith-refusal-to-pay, and breach-of-fiduciary-duty claims. However, the trial court left Pabon and Barakat's negligence and fraud claims pending; those claims were tried on April 28, 2000. However, the trial court declared a mistrial because the parties could not determine the Nationwide policies or procedures in effect on March 6, 1996, the day Pabon completed the application for insurance.
On August 7, 2000, Pabon and Barakat moved to set aside the trial court's April 11, 2000, order. They renewed their objection to a nonjury trial on the coverage issue. The trial court denied that motion on August 18, 2000.
In 2002, this case was assigned to another trial judge.[10] Shortly thereafter, Pabon and Barakat filed a renewed motion to set aside the April 11, 2000, order. Nationwide and Davis objected. The trial judge granted the motion, set aside the April 11, 2000, order, and reinstated all claims asserted against Nationwide and Davis for a jury trial.
On June 9, 2003, this case was tried before a jury. The trial court entered a preverdict judgment as a matter of law in favor of Davis on all claims asserted against her. The trial court also entered a preverdict judgment as a matter of law in favor of Nationwide on all claims asserted by Pabon and Barakat against Nationwide other than the breach-of-contract claim.[11] The trial court submitted Pabon and Barakat's breach-of-contract claim against Nationwide to the jury.[12]
The jury returned a verdict in favor of Pabon and Barakat, awarding damages in the amount of $250,000 and awarding interest on that award at the rate of 6% per annum, which totaled $115,300. On June 18, 2003, the trial court entered a judgment on the jury's verdict in the amount of $365,300.
Nationwide filed a motion for a judgment as a matter of law, or a motion for a remittitur, or, alternatively, for a new trial. Nationwide argued that the trial court lacked jurisdiction to vacate the April 11, 2000, order; that the evidence did not support the jury's verdict on the breach-of-contract claim; that the trial court erred in allowing the jury to consider the claim under the replacement-cost provision of the policy, which Nationwide refers to as the "dwelling claim"; and that the trial *Page 765 
court erred in submitting Pabon and Barakat's claim for interest to the jury. This motion was denied by operation of law.[13]
Nationwide appeals from the denial of its postjudgment motions, asserting the following:
 "I. The trial court erred in setting aside its prior order overruling the plaintiffs' objection to the non-jury trial.
 "II. The jury's verdict on plaintiffs' breach of contract claim is not supported by the evidence presented at trial.
 "III. The jury's verdict for compensatory damages for mental anguish is excessive as a matter of law and clearly based on bias, passion or prejudice.
 "IV. The court erred in allowing the jury to consider the dwelling claim.
 "V. The trial court erred in at least two ways by submitting the plaintiffs' claim for interest to the jury."
 Discussion
Did the trial court err in setting aside its April 11, 2000, order, in which it concluded that no coverage was due under the insurance policy Nationwide issued to Pabon?
Nationwide argues that because they failed to file a petition for a writ of mandamus Pabon and Barakat waived their right to contest the April 11, 2000, order denying Pabon's request for a jury trial; that the trial court lacked jurisdiction to vacate its April 11, 2000, order; and that Pabon and Barakat's motion to set aside the April 11, 2000, order was untimely and, even if timely, was procedurally flawed. We disagree.
The trial court's April 11, 2000, order addressed only the issue whether coverage was due under the insurance policy; it left the negligence and fraud claims asserted by Pabon and Barakat pending for a jury trial. None of the parties requested that the April 11, 2000, order be certified pursuant to Rule 5(a), Ala. R.App. P., for an interlocutory appeal. Therefore, the order remained subject to revision at any time before the trial court entered its final judgment in 2002. See Rule 54(b), Ala. R. Civ. P.
We also acknowledge that, as Nationwide argues, a petition for a writ of mandamus is the proper mechanism for contesting the denial of a request for a jury trial under the appropriate circumstances. See, e.g., Ex parte Flodin, 822 So.2d 372 (Ala. 2001). However, as Pabon and Barakat argue, review by a petition for a writ of mandamus is not the sole means of review available to a party whose jury demand has been denied. This Court has addressed the denial of a jury demand on appeal. See Poff v.Hayes, 763 So.2d 234 (Ala. 2000) (on appeal from a judgment entered after a bench trial, this Court held that the trial court erred in striking the plaintiff's demand for a jury trial);Baggett v. Sims, 387 So.2d 792 (Ala. 1980) (on appeal from a judgment entered after bench trial, this Court held that the trial court erred in overruling the plaintiff's demand for a jury trial). Under the procedural posture of this case, the trial court was within its right to revise the earlier order setting the coverage issue for a nonjury trial. *Page 766 
Finally, for the same reasons stated above, we reject Nationwide's argument that Pabon and Barakat's renewed motion to set aside the April 11, 2000, order was untimely and procedurally flawed. Nationwide relies on Ex parte Allstate Life InsuranceCo., 741 So.2d 1066 (Ala. 1999); Ex parte Dowling,477 So.2d 400 (Ala. 1985); Ex parte Keith, 771 So.2d 1018 (Ala. 1998); and Rules 59 and 60(b), Ala. R. Civ. P., as authority for its argument. However, those cases and rules, and the legal principles cited or reflected therein, address final judgments, not interlocutory orders, and the filing of postjudgment motions, not a motion to set aside an interlocutory order. In this case, the trial court did not certify the April 11, 2000, order for interlocutory appeal. Therefore, the cases relied upon by Nationwide are inapplicable. The trial court did not err in setting aside the order of April 11, 2000, and reinstating the claims for a jury trial.
 Did the trial court err in denying Nationwide's postjudgment motion for a judgment as a matter of law?
Nationwide argues that the trial court should have granted its postjudgment motion for a judgment as a matter of law because, it argues, no breach of contract occurred. We review the grant or denial of a motion for a judgment as a matter of law under the following standard:
 "`The standard of review applicable to a motion for directed verdict or judgment notwithstanding the verdict [now called a preverdict motion and a postverdict motion for a judgment as a matter of law, see Rule 50, Ala. R. Civ. P.] is identical to the standard used by the trial court in granting or denying the motions initially. Thus, when reviewing the trial court's ruling on either motion, we determine whether there was sufficient evidence to produce a conflict warranting jury consideration. And, like the trial court, we must view any evidence most favorably to the non-movant.'"
Glenlakes Realty Co. v. Norwood, 721 So.2d 174, 177 (Ala. 1998) (quoting Bussey v. John Deere Co., 531 So.2d 860, 863 (Ala. 1988)).
Nationwide argues that no breach of the insurance policy occurred because, based on the misrepresentations on the application, Pabon was not entitled to recover benefits under the policy. Nationwide relies on § 27-14-7, Ala. Code 1975, which provides:
 "Misrepresentations, omissions, concealment of facts and incorrect statements shall not prevent a recovery under the policy or contract unless either:
"(1) Fraudulent;
 "(2) Material either to the acceptance of the risk or to the hazard assumed by the insurer; or
 "(3) The insurer in good faith would either not have issued the policy or contract, or would not have issued a policy or contract at the premium rate as applied for, or would not have issued a policy or contract in as large an amount or would not have provided coverage with respect to the hazard resulting in the loss if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise."
Under this Code section, it is not necessary that the insured have made the misrepresentation with an intent to deceive; even if innocently made, an incorrect statement that was material to the acceptance of the risk assumed by the insurer or that would have caused the insurer in good faith not to issue the policy provides a basis for the insurer to avoid the policy. See, e.g.,Taylor v. Golden Rule Ins. Co., 544 So.2d 932 (Ala. 1989); *Page 767 
§ 27-14-7, Ala. Code 1975. To invoke § 27-14-7, an insurer need establish only that a misrepresentation in the application was a material contributing influence that induced the insurer to issue the policy. That the insurer could make its own investigation does not lessen its right to rely on the representations in the application. See Reliance Life Ins. Co. v. Sneed, 217 Ala. 669,117 So. 307 (1928).
Under Alabama law, the materiality of a misrepresentation on an application for an insurance policy is generally a jury question.Bennett v. Mutual of Omaha Ins. Co., 976 F.2d 659 (11th Cir. 1992); Clark v. Alabama Farm Bureau Mut. Cas. Ins. Co.,465 So.2d 1135 (Ala.Civ.App. 1984). However, it has been held that some misrepresentations, whether made intentionally or innocently, increase the risk of loss as a matter of law and are therefore material to the issuance of the policy. See, e.g.,Clark, supra; Thomas v. Liberty Nat'l Life Ins. Co.,368 So.2d 254 (Ala. 1979); Gunn v. Palatine Ins. Co., 217 Ala. 89,114 So. 690 (1927); Inglish v. United Servs. Gen. Life Co.,394 So.2d 960 (Ala.Civ.App. 1980).
Pabon argues that her oral answers to the questions were accurate but that the agent then incorrectly recorded the information on the application. Pabon argues that the answers on the application should not be imputed to her when, she alleges, the agent improperly recorded Pabon's responses and Pabon merely failed to notice those incorrect answers before she signed the application. We reject these arguments.
It is undisputed that Pabon knew of her husband's pending bankruptcy proceeding when she applied for the Elite II homeowner's policy; it is also undisputed that the insurance application indicates "no" in response to the following question: "[H]as insured or family member been sued, filed bankruptcy, had repossession/judgment within the last 7 years?" It is also undisputed that Pabon was given the opportunity to review the application with the printed answers before she signed it; Pabon signed the application directly below the following statement:
 "I hereby declare that the facts stated in the above application are true and request the company to issue the insurance and any renewals thereof in reliance thereon."
Absent misrepresentations, fraud, or other deceit by the agent, a person able to read and write is bound by an insurance application signed by him or her, whether or not he or she reads it. First Nat'l Life Ins. Co. of America v. Maxey,25 Ala.App. 289, 145 So. 589 (1932). Because Pabon was given the opportunity to review the answers on the insurance application before she signed it, we reject the arguments that Nationwide's agent created the inaccuracies on the application and that Nationwide waived its right to defend on the basis that the application contained innocent but material misrepresentations. We conclude that Pabon is bound by the answers on the insurance application.
We also conclude that those misrepresentations were material to Nationwide's acceptance of the risk presented here. Nationwide's underwriter testified that, under the underwriting standards in effect at Nationwide at the time Pabon's application was filed, an applicant who had filed a petition in bankruptcy within the previous five to seven years was ineligible for homeowner's insurance with Nationwide. More specifically, Nationwide's underwriter testified that Barakat's bankruptcy (as well as his prior loss history) made him ineligible for coverage with Nationwide. For these reasons, we conclude that Pabon's answers were material as a matter of law to Nationwide's acceptance of this risk, and we conclude that had *Page 768 
Nationwide received accurate answers on that application, it would not have issued the Elite II insurance policy at issue in this case.
 Conclusion
Pabon's misrepresentation on the application for insurance to the question "[H]as insured or family member been sued, filed bankruptcy, had repossession/judgment within the last 7 years?" was material as a matter of law to Nationwide's acceptance of this risk; but for that misrepresentation, Nationwide would not have issued the Elite II policy to Pabon. As a result of this material misrepresentation, Nationwide was relieved of its obligation under the policy of insurance to Pabon, pursuant to §27-14-7(a)(2), Ala. Code 1975. Nationwide is also relieved of its obligation by virtue of § 27-14-7(a)(3), Ala. Code 1975, because, had Nationwide received accurate information on the application, it would not have issued the Elite II insurance policy to Pabon. We reverse the judgment entered against Nationwide on the jury's verdict, and we remand with directions to enter a judgment in favor of Nationwide. Because of our resolution of this issue, we pretermit any consideration of the other issues raised on appeal.
REVERSED AND REMANDED WITH DIRECTIONS.
NABERS, C.J., and HOUSTON, SEE, LYONS, BROWN, and HARWOOD, JJ., concur.
JOHNSTONE, J., dissents.
[1] The parties dispute who decided what name to place on the policy. According to Davis, Pabon reported that she used both names and that both names should be shown on the policy. At the trial, Pabon testified:
 "A. Well, when I got to see her, she [Davis] requested my driver's license. . . . And my driver's license [shows] Sandra Pabon. Then I told her — and she asked me, is this what you want in on the application. I said, well, I'm married. And I asked should I put mine or my husband's name or should I put just my name.
 "Q: And then did she [Davis] advise you one way or another?
 "A: Well, she made a statement: She said, go girl. This is the '90s. You know, I'm putting your name. If something happens, you end up with the house, you know. So go ahead and put your name. And then I said, I'll put my name and I put Barakat also or Barakat."
However, in her 1997 examination under oath, when Pabon was asked if she and Davis had any discussion whether the policy should be in her name or her husband's name, Pabon simply answered: "Well, she said I bought it. I said, well, let me put it in my name, but I said, I just want to keep the Barakat. Sometimes I use Barakat and sometimes I use Pabon. So I said, just put it in Pabon and Barakat either way."
[2] Nationwide obtained information that revealed Barakat had had several automobile accidents and had been cited for traffic violations, as well as the following:
 1. A February 17, 1994, claim for a stolen 1984 BMW automobile; the insurer paid $7,050;
 2. A 1994 claim for a theft from a business of which Barakat was the sole proprietor;
 3. A May 14, 1995, claim for a stolen 1995 Chevrolet pickup; and
 4. An October 6, 1995, claim for wind damage to the dwelling at issue in this case. Although it is unclear, it appears that each of these claims was made under a different policy. Additionally, Barakat was engaged in the business of buying and selling automobiles. He operated this business as a sole proprietorship. Therefore, he obtained insurance on the automobiles in his individual name. The stolen-automobile claims appear to be related to his business activities.
[3] Pabon testified that she and Barakat asked Davis for assistance in completing the inventory forms. She asserted that Davis instructed them to list replacement prices for items comparable to those lost in the fire, which would then be depreciated and that Davis actually wrote down much of the information in pencil and Pabon then wrote over Davis's writing in pen. Pabon asserted that she knew her personal-property coverage was limited to $70,000 and that she never expected to recover more than $70,000 under that policy.
However, in an examination under oath, taken approximately a month after the fire, Pabon testified: "Just me and Khaldoon [talked about the amount of money they needed to claim from the insurance company]. We just filled that out and came up with the prices." Pabon also acknowledged that Barakat had already consulted with an attorney in conjunction with preparing the proof-of-loss claim form and in handling the claim in general when she and Barakat completed the proof of loss.
[4] "Sifting" is the process of searching the remains at the scene of a fire in an attempt to identify the inventory of a building before the fire.
[5] Nationwide also discovered that, at the time of the fire, Barakat was in arrears on both mortgages.
[6] Pabon and Barakat claimed that the results of the sifting did not correlate with their inventory forms because many of the items had disappeared from the fire scene by the time the sifting was performed. However, at trial, Nationwide pointed out that, on their personal-property inventory forms, Pabon and Barakat identified many of the items as being two to three years old. Nationwide presented financial records that indicated that the wages earned by Pabon and Barakat in the two to three years before the fire would not have afforded them the opportunity to purchase the items listed on their personal-property inventory forms. Nationwide also pointed out that the items listed by Pabon and Barakat on their personal-property inventory forms did not correlate with the personal property Barakat claimed in his bankruptcy petition that he owned.
[7] Nationwide also named as counterplaintiffs The Associates and Joyce Owens, as the mortgagees on the property at issue. All claims involving The Associates and Joyce Owens were resolved after Nationwide paid the dwelling coverage limits of $101,000 into court.
[8] In addition to the errors previously identified, other errors were found on the application. Pabon argued that those errors indicated that Davis negligently completed the application and that Davis, rather than Pabon, was responsible for any material misstatements of fact in the application.
[9] However, Barbara Barclay, the Nationwide adjuster assigned to investigate Pabon's claim, did not obtain the underwriting file to determine what information Nationwide obtained when it processed Pabon's application for insurance. Pabon claimed that, several weeks after she applied for insurance, she obtained a copy of her credit report. She claimed that the report she obtained indicated one of her credit-card accounts was involved in the bankruptcy of another individual. Thus, Pabon argued that if Nationwide had performed any investigation at all, it would have discovered the information it claimed was material to the risk.
[10] The trial court judge to whom the case had been originally assigned retired.
[11] Pabon and Barakat have not appealed from those judgments.
[12] At the close of Pabon and Barakat's case and again at the close of its own evidence, Nationwide moved for a judgment as a matter of law on the breach-of-contract claim. The trial court denied those motions.
[13] On October 24, 2004, after the postjudgment motion had been denied by operation of law, the trial court purported to grant Nationwide's motion for a remittitur, agreeing that the jury should not have awarded interest on the damages awarded to Pabon and Barakat for mental distress. On that basis, the trial court ordered a remittitur of the damages from $365,300 to $294,135. However, at that time the trial court no longer had jurisdiction and could not order a remittitur.