PITTMAN, Judge.
 

 American Heritage Life Insurance Company (“the insurer”) appeals from a judgment of the Bullock Circuit Court awarding John Blackmon and Tchernavia Blackmon the sum of $10,000 on the Blackmons’ breach-of-contract claim against the insurer arising out of the insurer’s refusal to pay an insurance claim submitted by the Blackmons with respect to the death of Mrs. Blackmon’s son, Jeffery Williams (“the decedent”). We reverse and remand with instructions.
 

 The pertinent facts are as follows. In November 2002, representatives of the insurer went to Bullock Correctional Facility to solicit insurance-policy applications from workers there. Mrs. Blackmon, who had been an employee of the Department of Corrections for approximately 15 years and who had completed high school and could read and write, entered into a conversation with one of those representatives concerning the acquisition of a policy of insurance upon the life of Mr. Blackmon, during which a representative advised her that her own children “would be covered” under such a policy. Mrs. Blackmon then elected to complete an application for a policy of insurance that would afford coverage not only for Mr. Blackmon but also for his children and stepchildren.
 

 In an effort to obtain the desired insurance coverage, Mrs. Blackmon, with the assistance of the insurer’s representative, completed a form labeled “Application for Life and Health Insurance” listing Mr. Blackmon as the “Proposed Insured” and herself as the owner and primary beneficiary of the policy. The first page of the application listed the product desired as a “Universal Life” policy with a death bene
 
 *1030
 
 fit of $54,487 and bore a marked check-box indicating “Simplified Issue”; the application further showed that a “CTR” life rider (indicating “children’s term rider”) was being sought with a death benefit of $10,000. The form also contained blanks for listing “Dependents Proposed For Coverage,” in which Mrs. Blackmon identified “Tashina G. Archie” and “Macorius Harris,” who were respectively disclosed as being 18 years old and 11 years old.
 

 At the time that Mrs. Blackmon submitted her application, however, Mr. Black-mon and Mrs. Blackmon, taken together, were the parents of four additional children between the two of them. One of Mrs. Blackmon’s children, the decedent, was born to Mrs. Blackmon and Isom Coley in 1979 but lived with Mrs. Blackmon’s mother, Odessa Williams, in Atmore for the bulk of his life. The decedent was omitted from that section of the insurance application as a dependent proposed for coverage. When Mrs. Blackmon was asked about that omission at trial, she testified that, in the process of filling out her children’s names, she received a radio call directing her to report to another location at the facility. Mrs. Blackmon testified that she had then informed the insurer’s representative that she would have to leave and asked what needed to be done about listing other dependents, including the decedent (whom she apparently had identified as being “sick”); at that time, she said, she had been informed that her children would be covered because “the children didn’t have to be listed.” Despite the omission of the names of her and her husband’s four other children, including the decedent, from the application, Mrs. Blackmon admitted that she had, in fact, intended that all six children would be covered under the children’s term rider to the policy issued in response to the application.
 

 The second page of the insurance application contained, among other things, a number of additional questions to be answered by the applicant. The left side of the form contained labels indicating the applicability of each particular numbered interrogatory item to the pertinent policy sought, e.g., “All Life,” “All Life & Health,” “All Accident Plans and Riders,” and “Simplified Issue Disability Income & Sickness Riders.” Question 5, which bore the label “Simplified Issue Life $100,000 Or Below” (i.e., the form of coverage sought by Mrs. Blackmon), contained the following pertinent question:
 

 “Within the last 3 years, has
 
 any person to be insured: had a chronic disease
 
 (including but not limited to heart disorder, stroke, cancer, diabetes, etc.);
 
 been hospitalized; seen a physician
 
 (other than for colds, flu or normal pregnancy or a routine physical with no unfavorable results); or been counseled for or excessively used alcohol or any type of drugs?”
 

 Mrs. Blackmon’s application bears a response of “No” to that question.
 

 The application further directed the applicant to “list the required health history in Question 10” if any response to Questions 2 through 9 were in the affirmative. Question 10 requested the “Name” of the pertinent person to whom the positive response in Questions 2 through 9 applied, the “Nature of [the] Illness/Injury or Medical Attention/Reason Last Consulted,” the “Date and/or Duration” of the pertinent condition, and the “Name and Address of [the] Physician or Hospital/Clinic” that afforded treatment as to the condition. The response field for Question 10 was left blank.
 

 The record reflects that in 1991 the decedent was diagnosed with cerebral palsy, a chronic disease. From that year, the decedent was a paraplegic and required
 
 *1031
 
 significant assistive care, having ceased responding to communication attempts from family members and nurses. The decedent went blind in 1999, and from that time he required a breathing tube for his survival; also, according to the deposition testimony of Mrs. Blackmon’s mother, the decedent was under the care of a Mobile physician during the period from 1999 to 2002, and the decedent was admitted to a Mobile hospital for approximately 180 days between February 2000 and August 2002, within the three-year window as to which the application sought information as to “any person to be insured” under a simplified-issue life-insurance policy in the amount sought. It is also undisputed that Mrs. Blackmon knew of the decedent’s hospitalizations and medical conditions at the time she applied for the insurance policy.
 

 The bottom portion of the application at issue contains spaces for the signatures of the proposed insured and the owner of the policy sought. Immediately above the signature lines appears the following provision:
 

 “I have read or had read to me the completed application and understand that any misstatement or misrepresentation in the application may result in loss of coverage. I represent that statements and answers given on this application are true, complete, and correctly recorded. ... I also understand that no agent has authority to waive any answer or otherwise modify this application, or to bind this company in any way by making any promise or representation that is not set out in writing on this application.”
 

 Mrs. Blackmon, after having been afforded the opportunity to review the application, signed the application for both herself and Mr. Blackmon, and in response to the application and in reliance upon the answers given, the insurer issued an insurance policy containing a children’s term rider affording coverage for “any ... stepchild ... of the insured” who “is ... named in the application and is less than 25 years of age” subject to a two-year period of con-testability for causes other than nonpayment of premium. The policy issued specifically provided that the parties’ contract consisted not only of the policy, amendments, endorsements, and riders, but also the application submitted.
 

 In 2004, Mrs. Blackmon filed a claim for an award of death benefits under the policy with respect to the decedent, who had died in November 2003 at the age of 24 years. In August 2004, Mr. Blackmon was notified by letter that the claim would be denied. The denial letter noted that the decedent had not been listed on the application; moreover, it noted that, “had [the decedent’s] medical history been known, dependent coverage on [the decedent] would not have been issued” by the insurer.
 

 In February 2005, the Blackmons sued the insurer, alleging claims based upon theories of breach of contract, bad-faith refusal to pay or investigate as to a valid insurance claim, fraud, and negligence or wantonness in hiring, training, and supervising employees; they sought damages in the amount of $74,999. The insurer answered the complaint, and in an amended answer asserted, as an affirmative defense, that “[t]he omissions in the application or incorrect information supplied makes the policy subject to rescission under ... § 27-14-7,” Ala.Code 1975. After an ore tenus proceeding, the trial court entered a judgment in favor of the Black-mons and awarded them $10,000 plus costs, opining that while “there is a general question on the application about the health of life applicants,” that question “does not indicate that it applies to chil
 
 *1032
 
 dren term riders,” whereas “[o]ther portions of the applications specifically refer to riders.” According to the trial court, it is “unclear whether the application even requests information about the health of the applicant’s children,” and that that “ambiguity” in the application was to be “resolved against” the insurer. The insurer appealed to this court; we have appellate jurisdiction based upon the amount in controversy (see Ala.Code 1975, § 12-3-10).
 

 On appeal, the insurer reiterates its contention that it was entitled to reject the insurance claim presented as to the decedent’s death on the authority of Ala.Code 1975, § 27-14-7. In pertinent part, that section provides:
 

 “(a) All statements and descriptions in any application for an insurance policy or annuity contract, or in negotiations therefore, by, or in behalf of, the insured or annuitant shall be deemed to be representations and not warranties.
 
 Misrepresentations, omissions, concealment of facts and incorrect statements shall not prevent a recovery under the policy or contract unless either:
 

 “(1) Fraudulent;
 

 “(2)
 
 Material either to the acceptance of the risk or to the hazard assumed by the insurer; or
 

 “(3) The insurer in good faith would either not have issued the policy or contract, or would not have issued a policy or contract at the premium rate as applied for, or would not have issued a policy or contract in as large an amount or would not have provided coverage with respect to the hazard resulting in the loss if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise.”
 

 (Emphasis added.) As our Supreme Court has noted:
 

 “Under this Code section [§ 27-14-7], it is not necessary that the [applicant] have made the misrepresentation with an intent to deceive; even if innocently made, an incorrect statement that was material to the acceptance of the risk assumed by the insurer or that would have caused the insurer in good faith not to issue the policy provides a basis for the insurer to avoid the policy. To invoke § 27-14-7, an insurer need establish only that a misrepresentation in the application was a material contributing influence that induced the insurer to issue the policy. That the insurer could make its own investigation does not lessen its right to rely on the representations in the application.”
 

 Nationwide Mut. Fire Ins. Co. v. Pabon,
 
 903 So.2d 759, 766-67 (Ala.2004) (citations omitted).
 

 During this litigation, the insurer has not relied upon the absence of the decedent’s name from the list of dependents proposed for coverage in the application, and the insurer’s director of underwriting admitted that
 
 that
 
 omission was not “relevant,” i.e., not a material issue. Rather, the insurer has contended that, and adduced uncontradicted evidence indicating that, the failure of the application to disclose the decedent’s medical history
 
 was
 
 material to the insurer’s acceptance of the risk of insuring all Mr. Blackmon’s six children and stepchildren. Thus, if it is
 
 assumed
 
 that the application form called for a positive response from Mrs. Black-mon as to either of the inquiries in Question 5, the fact that no positive response was given satisfies the materiality-of-the-risk criterion of § 27-14-7(a)(2), and we are left with considering the validity of that assumption, i.e., whether there is a “[misrepresentation! ],” an “omission! ],” a “concealment of facts,” or an “incorrect statement” on the part of Mrs. Blackmon.
 
 *1033
 
 As to this issue, the trial court and the Blackmons’ brief offer different rationales in support of the judgment, which we will consider seriatim.
 

 The trial court based its judgment in favor of the Blackmons on the purported existence of a patent ambiguity in the application form itself that, the trial court said, was due to be construed in favor of the Blackmons; the trial court therefore determined that there could have been no misrepresentation, omission, concealment, or incorrect statement upon which the insurer could properly rely in defense of the Blackmons’ breach-of-contract claim. Our examination of the application form submitted by Mrs. Blackmon compels us to reach a contrary conclusion.
 

 The first page of the application clearly identifies that the product sought is a life-insurance policy to be issued in a face amount of $54,487 on a simplified-issue basis (with a children’s term rider). Question 5 on page 2 of the application bore the notation that it was applicable when the product requested was “Simplified Issue Life $100,000 Or Below,” and that question sought historical health information pertinent to “any person to be insured.” Mrs. Blackmon answered “No” to both pertinent queries. The presence of another question on the second page of the form applicable to “All Accident Plans And Riders” — which, it should be noted, bears no responses, indicating that the parties
 
 knew
 
 of the inapplicability of that question— does not bear upon the clarity of the request in Question 5 for health information as to
 
 any
 
 person to be covered under a simplified-issue life-insurance policy with a death benefit of less than $100,000. Given Mrs. Blackmon’s intent that the insurance for which she was applying would cover not only Mr. Blackmon as the proposed named insured, but also all of his six children and stepchildren, it cannot properly be said that Question 5, as printed on the application form, is patently ambiguous.
 

 For their part, the Blackmons seek to defend the trial court’s judgment on the basis that the insurer’s representative who assisted Mrs. Blackmon in completing the application orally posed to her the questions on the second page of the application form in a manner that suggested that only Mr. Blackmon’s health history was material. In other words, the Blackmons assert the existence of a latent ambiguity in the insurer’s requests for information based upon Mrs. Blackmon’s trial testimony that the insurer’s representative “didn’t ask [her] anything about [her] children” and that, when she supposedly voluntarily informed the representative that the decedent “was sick,” she was told that “there was no need to list” the children in the application because they “would be covered.”
 

 However, the Blackmons’ argument as to this issue fails to take into account that Mrs. Blackmon not only acknowledged in her application form that she was representing to the insurer that the statements and answers
 
 “given on [the] application
 
 [were] true, complete, and correctly recorded,” but also her express understanding that “any misstatement or misrepresentation
 
 in the application
 
 [could] result in loss of coverage” (emphasis added). In
 
 Pabon,
 
 the Supreme Court rejected a similar contention that the conduct of an insurance agent in incorrectly recording answers on an application form did not vitiate the incorrectness of information submitted to an insurer when the application form, similar to the form at issue in this case, provided that the applicant was declaring the facts in the application to be true and was requesting the pertinent insurer to rely upon those disclosures in issuing a policy of insurance. The Supreme Court reasoned:
 

 
 *1034
 
 “It is undisputed that Pabon knew of her husband’s pending bankruptcy proceeding when she applied for the Elite II homeowner’s policy; it is also undisputed that the insurance application indicates ‘no’ in response to the following question: ‘[H]as insured or family member been sued, filed bankruptcy, had repossession/judgment within the last 7 years?’ It is also undisputed that Pabon was given the opportunity to review the application with the printed answers before she signed it ....
 

 “Absent misrepresentations, fraud, or other deceit by the agent, a person able to read and write is bound by an insurance application signed by him or her, whether or not he or she reads it.
 
 First Nat’l Life Ins. Co. of America v. Maxey, 25
 
 Ala.App. 289,
 
 145 So.
 
 589 (1932). Because Pabon was given the opportunity to review the answers on the insurance application before she signed it, we reject the arguments that Nationwide’s agent created the inaccuracies on the application and that Nationwide waived its right to defend on the basis that the application contained innocent but material misrepresentations. We conclude that Pabon is bound by the answers on the insurance application.”
 

 903 So.2d at 767. In this case, the Black-mons, like Pabon, are bound by the answers given on the pertinent application form and may not properly rely upon contradictory information given by, or given to, an insurer’s soliciting agent concerning the information sought by or provided on the application itself. Accord Alfa
 
 Life Ins. Corp. v. Lewis,
 
 910 So.2d 757, 762 (Ala.2005) (“even if innocently made, an incorrect statement that is material to the risk assumed by the insurer or that would have caused the insurer in good faith not to issue the policy in the manner that it did provides a basis for the insurer to avoid the policy”).
 

 Moreover, a fair reading of the application form itself belies the propriety of any intei’pretation that the insurer was concerned in the application only with the health of Mr. Blackmon. Not only did Questions 2 through 9 of that application differentiate between those relating to the proposed named insured (i.e., the reference in Question 8 to “the proposed insured”) and those relating to all covered persons (i.e., the use of the phrase “any person to be insured” in Question 2), Question 10 requested the
 
 names
 
 of persons whose medical history was required to be detailed. If “any person to be insured” was properly to be read “any proposed named insured,” it would have been unnecessary to again request names in Question 10.
 

 Just as we are not convinced of the validity of the Blackmons’ ambiguity arguments, we cannot affirm the trial court’s judgment based upon any role that the insurer’s representative may have had in preparing portions of the application form. As
 
 Pabon
 
 makes clear, an applicant for insurance is bound by what is represented in the application when he or she has an opportunity to read the contents thereof. Even had the insurer’s representative, in contravention of the wording of the application form itself, requested that Mrs. Blackmon answer Question 5 based solely on Mr. Blackmon’s medical history, the application form expressly provided that no agent of the insurer would have authority to waive any answer or to otherwise modify the application or to bind the insurer by his or her representations in any manner not appearing on the face of the application itself.
 

 We conclude that the trial court erred in failing to enter a judgment in favor of the insurer based upon the provisions of Ala. Code 1975, § 27-14-7(a). The judgment
 
 *1035
 
 of the Bullock Circuit Court in favor of the Blackmons is, therefore, reversed, and the cause is remanded for the entry of a judgment in favor of the insurer.
 

 REVERSED AND REMANDED WITH INSTRUCTIONS.
 

 THOMPSON, P.J., and BRYAN, THOMAS, and MOORE, JJ., concur.