[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-14958
Non-Argument Calendar
_____

D.C. Docket No. 2:12-cv-02146-KOB

SCOTTSDALE INDEMNITY COMPANY,

Plaintiff-Counter Defendant-Appellee,

versus

MARTINEZ INC,

Defendant-Counter Claimant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(June 22, 2015)

Before ROSENBAUM, JULIE CARNES, and FAY, Circuit Judges.

PER CURIAM:

This declaratory-judgment action concerns a dispute over whether an insurance policy covers losses incurred by the insured as a result of one of its

employee's fraudulent conduct. The district court concluded that the insurer could avoid coverage under the policy because of material misrepresentations in the insurance application and, alternatively, because the fraudulent actor's knowledge of her own fraud could be imputed to the insured for purposes of determining when the fraud was "discovered" under the policy. After careful review, we affirm.

**I**.

Martinez Inc. ("MBS") is a building-maintenance company servicing commercial properties. Greg Martinez has been the company's president since its inception. The majority of his time was spent obtaining and servicing clients.

Before 2004, MBS utilized the accounting firm of Ben Bowen & Associates for nearly all of its bookkeeping, accounting, and tax services. In 2004, Ben Bowen recommended that MBS hire an internal accountant to handle its day-to-day finances. In August 2004, MBS hired Brenda Walters, who later became the Chief Financial Officer ("CFO") and Chief Executive Officer ("CEO"). Walters's job duties included handling the company's financial accounting. In that capacity, she had authority to make withdrawals from and deposits into MBS's bank accounts.

Walters was fired in August 2011 after Martinez discovered that Walters had been embezzling funds from MBS since at least 2006. An investigation into her fraudulent activities at MBS revealed that Walters wrote checks to herself and

2

others from MBS accounts and otherwise used company funds, such as the petty-cash account, and company credit cards for personal benefit. In total, Walters stole more than $2 million from MBS.

At the time that MBS learned of Walters's fraud, MBS was insured by Scottsdale Indemnity Company ("Scottsdale") under a Business and Management Indemnity Insurance policy, which ran from September 15, 2010, to September 15, 2011. The policy had a "Crime Coverage Section," which provided coverage for losses caused by employee theft or fraud. In January 2012, MBS submitted a claim for losses of over $2 million based on Walters's conduct.

In June 2012, Scottsdale denied coverage on two grounds. First, Scottsdale asserted that MBS had made material misrepresentations in the insurance renewal application—which was filled out and submitted by Walters—relating to its financial accounting practices. According to Scottsdale, the misrepresentations materially affected the risk of loss it assumed in insuring MBS. The pertinent provision from the insurance policy excludes coverage as follows:

> In the event the Application . . . contains any misrepresentation or omission made with the intent to deceive, or contains any misrepresentation or omission which materially affects either the acceptance of the risk or the hazard assumed by Insurer under this Policy, this Policy, including each and all Coverage Sections, shall not afford coverage . . . for any Claim alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way

3

involving, any untruthful or inaccurate statements, representations or information[.][1]

This provision applies to specified insureds only, including

> any Company . . . that is an Insured, if any past or present chief executive officer, chief financial officer, general counsel, risk manager or human resources director (or equivalent positions) of the Parent Company knew the facts misrepresented or the omissions, whether or not such individual knew of the Application, such materials, or this Policy.

Second, Scottsdale alternatively denied coverage on the ground that Walters's knowledge of her own fraudulent conduct is imputed to the company for purposes of determining when the loss was "discovered."  In support, Scottsdale cited two provisions from the policy.  One states that knowledge of an officer is imputed to the company as a whole:  "If any Insured, or any partner, officer or director of that Insured, has knowledge of any information relevant to this Crime Coverage Section, that knowledge is considered knowledge of every Insured."  The other relates to "Discovery" of the loss:

> The Insurer will pay for loss sustained by the Insured through acts committed or events occurring at any time and discovered by the Insured during the Policy Period. Discovery of loss occurs when an officer, director, Insurance Manager or Risk Manager first becomes aware of facts which would cause a reasonable person to assume that a loss covered by this Crime Coverage Section has been or will be incurred . . . .

---

[1]  The insurance policy also provided that the insurance application was incorporated into and constituted a part of the policy.

4

Based on these provisions, Scottsdale asserted, the loss was not discovered during the policy period because Walters's knowledge of her own embezzlement, before any policy had been issued by Scottsdale, is imputed to MBS.

Shortly after denying coverage, Scottsdale filed this lawsuit in the United States District Court for the Northern District of Alabama, seeking a declaratory judgment that no coverage exists under the policy in question. Scottsdale moved for summary judgment. Finding no genuine dispute as to any material fact and that Scottsdale was entitled to judgment as a matter of law, the district court granted summary judgment. This appeal followed.

## II.

We review *de novo* the district court's grant of a motion for summary judgment. *Travelers Props. Cas. Co. of Am. v. Moore*, 763 F.3d 1265, 1268 (11th Cir. 2014). In reviewing summary judgment, we resolve all factual ambiguities and draw all reasonable inferences in favor of the non-moving party. *Id.* Summary judgment should be granted "if the moving party shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We also review *de novo* the interpretation of provisions in an insurance contract. *St. Paul Fire & Marine Ins. Co. v. ERA Oxford Realty Co. Greystone, LLC*, 572 F.3d 893, 897 (11th Cir. 2009).

**III.**

Under Alabama law, courts must enforce insurance contracts as written unless an insurance provision is ambiguous. *St. Paul Fire & Marine Ins. Co.*, 572 F.3d at 898. If a provision is ambiguous as to whether coverage is afforded, the provision must be construed for the benefit of the insured. *Id.*

**A.**

Regarding Scottsdale's first ground for denying coverage, the policy places the following limits on when coverage may be denied. As relevant to this case, there must be (1) a misrepresentation or omission of facts, (2) (a) that was made with the intent to deceive or (b) which materially affects the risk of loss accepted by the insurer, (3) that resulted in or in any way involved the claim of loss, and (4) that was known by a past or present chief executive officer or chief financial officer of the insured company. We address each requirement in turn.

**1.**

MBS first contends that the district court erred in finding as a matter of law that Walters's responses on the insurance application were misrepresentations. In the application, Walters answered "yes" to the following two questions: "Is there an annual audit or review performance by an independent CPA on the books and accounts, including a complete verification of all securities and bank balances?" ("Question 3"); and "Are bank accounts reconciled by someone not authorized to

6

deposit or withdraw from those accounts?" ("Question 4").  Scottsdale contended, and the district court agreed, that these responses were untrue.

With regard to Question 3, MBS asserts that its accounts were reviewed every year by Bowen, an independent Certified Public Accountant ("CPA"). Although Bowen testified that he did not audit the accounts, he "reviewed data and accounts . . . to verify them for the tax return preparation."  This review included some steps to ensure the "reasonableness" of the financial information.  Based on Bowen's testimony, MBS contends that a genuine dispute exists as to whether Bowen conducted a "review" or "verification" as contemplated by the policy, particularly when those terms are not defined by the policy itself.

But we need not labor over defining the policy terms "review" or "verification."  *See St. Paul Fire & Marine Ins. Co.*, 572 F.3d at 897 ("If a word or phrase is not defined in the policy, then the court should construe the word or phrase according to the meaning a person of ordinary intelligence would reasonably give it.") (quotation omitted).  In the district court, MBS acknowledged in its response to Scottsdale's motion for summary judgment that Bowen's review did not include such a "complete verification."  *See* Doc. 46 at 17 ("Admittedly, MARTINEZ did not have a complete verification of all securities and bank balances performed[.]").  MBS cannot now argue the opposite for the first time on appeal.  *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir.

7

2004) ("This Court has repeatedly held that an issue not raised in the district court and raised for the first time in an appeal will not be considered by this court.") (internal quotation marks omitted).

In any case, no genuine factual dispute exists regarding whether Bowen conducted an "annual audit or review" that "includ[ed] a complete verification of all securities and bank balances." Bowen testified that he did not verify the accuracy of MBS's bank balances at any time after 2004, and that he never conducted an audit or a "formal report-generating review." Although he reviewed the accounts for "reasonableness" for tax-preparation purposes, he verified the accuracy of the information he received from MBS in only a "very cursory way." In sum, no reasonable jury could conclude that an "annual audit or review performance by an independent CPA on the books and accounts, including a complete verification of all securities and bank balances" occurred. Consequently, the district court properly found that Walters's response to Question 3 was a misrepresentation.

With regard to Question 4, MBS points to evidence that Walters's assistant, Jennifer Smith, reconciled the accounts at the time of the policy application. Smith was not authorized to deposit into or withdrawal from MBS's accounts. Therefore, according to MBS, the response to Question 4 was not false because the accounts

were in fact "reconciled by someone not authorized to deposit or withdraw from those accounts."

Even if we found plausible MBS's contention that the response was not technically false, we would nonetheless agree with the district court that the answer to Question 4 was a misrepresentation.  The answer that Walters provided on the application represented to Scottsdale that reconciliation functions at MBS were separated from deposit and withdrawal authority, when, in fact, no such separation of authority existed, as Walters would have been well aware.  Other undisputed evidence—which MBS claims is irrelevant—showed that Walters, who was authorized to deposit or withdraw from the accounts, also performed reconciliation functions.  For example, Walters had access to Smith's password and computer and used them to alter Smith's reconciliations of the accounts.  Thus, MBS's accounts were reconciled, at least in part, by someone who had withdrawal and deposit authority.  Accordingly, the district court properly found that there was no genuine dispute about whether Walters's answer to Question 4 was a misrepresentation.

**2.**

MBS next contends that the district court erred in finding as a matter of law that Walters's misrepresentations were made with the intent to deceive or that they were material to the risk of loss assumed by Scottsdale in insuring MBS.  Because

we conclude that the misrepresentations were material, we do not address whether they were made with the intent to deceive.

"Under Alabama law, the materiality of a misrepresentation on an application for an insurance policy is generally a jury question." *Nationwide Mut. Fire Ins. Co. v. Pabon*, 903 So. 2d 759, 767 (Ala. 2004). Nonetheless, "some misrepresentations, whether made intentionally or innocently, increase the risk of loss as a matter of law and are therefore material to the issuance of the policy." *Id.*; *see Richerzhagen v. Nat'l Home Life Assurance Co. of New York*, 523 So. 2d 344, 347 (Ala. 1988) ("If the facts as to materiality are undisputed, then the question need not be submitted to the jury.").

In general, a fact is material if it would have increased the risk of loss to the insurer and would have induced a rational underwriter to reject the risk or accept it only at an increased premium. *Clark v. Ala. Farm Bureau Mut. Cas. Ins. Co.*, 465 So. 2d 1135, 1139 (Ala. Civ. App. 1984). Ala. Code § 27–14–7 likewise provides that an insurer may avoid a policy where a misrepresentation is material "to the acceptance of the risk or to the hazard assumed by the insurer," or where it would have caused the insurer in good faith not to issue the policy or not to issue the policy at the premium rate as applied for. *See Pabon*, 903 So. 2d at 767.

We conclude that undisputed evidence establishes that the misrepresentations were material to the issuance of the policy. Paul Tomasi, the

10

President of E-Risk, Scottsdale's underwriter, executed a declaration stating that Scottsdale's underwriting policies assigned a higher rating factor and higher total premium where an insured answers "no" to Questions 3 and 4.  He explained that the answers to those questions are "extremely important in assessing the crime risk to be assumed because many, if not most, employee theft losses involve employees who handle money and who have access to the insured's receipts, checkbook or deposits."  Further, Tomasi noted, "internal accounting controls" and independent oversight to ensure the controls are working and to increase the likelihood of early detection "directly bear[] on the potential exposure to loss faced by the insurer."  Such oversight and early detection were particularly important, Tomasi stated, for policies like MBS's, which covered losses sustained at any time but discovered during the policy period.  Thus, Tomasi attested that E-Risk as general agent for Scottsdale would normally have charged an increased premium for the policy in question had Walters provided correct answers about MBS's accounting practices. *See Clark*, 465 So. 2d at 1139.

MBS contends that the deposition testimony of Michael Kinsley, the individual underwriter at E-Risk who handled MBS's account, contradicts Tomasi's declaration and shows that the responses to Questions 3 and 4 were not in fact taken into account in assessing the risk of loss in this case.  On that basis,

11

MBS asserts that genuine issues of fact remain about whether the misrepresentations were material. We respectfully disagree.

Kinsley's testimony reflects that E-Risk's software program, which normally generates a baseline quotation based on the answers provided in the insurance application, could not automatically generate a quotation for MBS for the "Crime Coverage Section" due to its "nature of operations." The software program adjusted the baseline rate based on how an applicant's business operations were categorized. Thus, the nature of MBS's business operations did not fit into one of the software's categories, so a quotation could not automatically be generated. But the fact that a quotation was not automatically generated does not suggest or imply that Kinsley or Scottsdale did not take into account the responses to Questions 3 and 4 in determining the premium, or that the misrepresentations did not affect the risk of loss or the hazard assumed by Scottsdale.

MBS also asserts that Kinsley did not or could not have taken into account the responses to Questions 3 and 4 because he did not understand what was involved in an audit or review of financial records. But this does not contradict Tomasi's testimony that "No" responses to these questions would normally have resulted in a higher premium. Kinsley did not need to personally understand the reasons behind Scottsdale's and E-Risk's policies in order to apply them. Nor was Kinsley's discretion to adjust the premium rate sufficient evidence to create a

12

material issue of fact regarding whether the lack of accounting controls and oversight materially affected the risk of loss.

MBS also argues that summary judgment cannot be granted based solely on the testimony of the underwriter. This Court has recognized that "under Alabama law, the uncontradicted testimony of an insurance company's underwriter that a misrepresentation was material and that the company in good faith would not have issued the policy as written, is not necessarily dispositive." *Bennett v. Mut. of Omaha Ins. Co.*, 976 F.2d 659, 661 (11th Cir. 1992); *see also Nationwide Mut. Fire Ins. Co. v. Guster Law Firm, LLC*, 944 F. Supp. 2d 1116, 1128 (N.D. Ala. 2013) (same). On on at least one occasion since our decision in *Bennett*, however, the Alabama Supreme Court has relied solely on the testimony of an insurer's underwriter to conclude that a misrepresentation was material to the insurer's risk of loss as a matter of law. *See Pabon*, 903 So. 2d at 767-68 (relying on an underwriter's testimony about underwriting standings to conclude that an insured's misrepresentation as to whether a family member recently had filed for bankruptcy was material as a matter of law).

Here, while not necessarily dispositive, Tomasi's testimony was supported by other uncontradicted evidence in the record. For example, Scottsdale submitted evidence of its underwriting guidelines, which provided that an upward "rating modifier" applied where "no" responses are given to Questions 3 and 4. In

13

addition, the fact that the questions were asked on the insurance application and that the application warned that all responses were considered material further supports the materiality of the responses.[2] *See Alfa Life Ins. Corp. v. Lewis*, 910 So. 2d 757, 762 (Ala. 2005) (finding an answer material because the question was asked in the insurance application and the application warned that the answer would have made her ineligible for coverage). Finally, that Walters's criminal conduct itself was allowed to continue over a lengthy period of five to seven years, when it likely would have been found had the controls inquired about in Questions 3 and 4 been in place, indirectly exemplifies the materiality of the misrepresentations. As the district court stated, "Indeed, if MBS had in place a complete independent audit and bank reconciliation independent of Walters, her scheme would not have been successful for as long as it was."

For these reasons, the district court did not err in concluding as a matter of law that the misrepresentations were material to the risk of loss.

---

[2] The policy contained a provision deeming all statements in the insurance application material to the acceptance of the risk or the hazard assumed by Scottsdale. We do not rely on this provision exclusively to find materiality, *see State Farm Fire & Cas. Co. v. Oliver*, 854 F.2d 416, 419-20 (11th Cir. 1988) (stating that the insurance contract cannot make the requirements for voiding an insurance policy more stringent on the insured than those provided by Ala. Code § 24–14–7), but the provision is, nonetheless, evidence that Scottsdale considered the responses to be material.

14

**3.**

MBS does not contest that the misrepresentations and the claim of loss based on Walters's conduct were related to one another. For reasons already stated, we likewise find the evidence undisputed that the third requirement is met.

**4.**

Finally, there is no genuine dispute of fact that Walters, who was the CEO/CFO of MBS, knew the facts misrepresented, even assuming that she did not intend to deceive Scottsdale. With regard to Question 4, Walters knew that someone with withdrawal and deposit authority was performing reconciliation functions, namely, Walters. Regarding Question 3, as CFO, Walters handled all of MBS's financial accounting, including supplying financial information to Bowen for purposes of preparing tax returns. It is also undisputed that Walters was embezzling funds from MBS for many years and that she altered MBS's financial records to cover up her theft. Based on this evidence, and for the reasons explained above, the district court did not err in finding that no reasonable jury could conclude that Walters did not know of the facts misrepresented.

**B.**

Alternatively, the district court determined that coverage could be avoided under the policy because the losses suffered by MBS were not "discovered" during the policy period. According to the court, Walters's knowledge of her own

15

fraudulent activity is imputed to MBS, so MBS knew of the loss (through Walters) before the policy period.

On appeal, MBS argues that Walters's knowledge cannot be imputed to MBS because Walters was acting adverse to MBS's interests.  If the discovery provision in the policy could be construed to exclude coverage in these circumstances, MBS contends, it would effectively "exclude from coverage all claims for misdeeds of officers and directors—the very people in a position to cause a loss to an insured."

We decline to address this alternative ground because the district court properly granted summary judgment on the first ground for the reasons explained above.

## IV.

In sum, we affirm the entry of summary judgment in favor of Scottsdale.

**AFFIRMED.**